**DGS CONTRACT SERVICE, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–891C.

United States Court of Federal Claims.

March 8, 1999.[1]

---

1. This opinion was originally issued and filed under seal on February 22, 1999. The parties were directed to advise the court regarding any portions of the opinion that should be redacted prior to publication. Only plaintiff proposed redactions. The court did not redact all the requested material because, in the court's view, the information was neither confidential nor protected. Redactions are indicated by asterisks within brackets ( [* *] ).

Richard D. Lieberman, Arlington, Virginia, attorney of record for plaintiff. Kinosky, Phillips & Lieberman, PLC; James S. Del-Sordo, of counsel.

Kenneth S. Kessler, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Frank W. Hunger, for defendant. David M. Cohen, Director, Robert E. Kirschman, Jr., Assistant Director, and James M. Donovan, Jr., General Legal Services, MidStates Region, Internal Revenue Service, of counsel.

## OPINION

FUTEY, Judge.

This post-award bid protest action is before the court on the parties' cross-motions for summary judgment on the administrative record. Plaintiff also requests a permanent injunction. Plaintiff maintains that the discussions held by the Internal Revenue Service (IRS) with offerors in the competitive range violated the Procurement Integrity Act, 41 U.S.C. § 423 (Supp. II 1996) and

several procurement regulations, and thus it is entitled to judgment as a matter of law. Conversely, defendant avers that its actions during the procurement process complied with the Procurement Integrity Act and procurement regulations, and therefore it is entitled to judgment as a matter of law.

### Factual Background

On May 20, 1998, defendant, through the IRS's Midstates Procurement Office, issued solicitation number TIRMS–98–R–00019 (the solicitation), seeking offers for a five-year contract for guard services at its Ogden Service Center in Ogden, Utah. The solicitation sought a contractor to provide "all management, supervision, labor, materials, supplies and vehicles for armed security guard service."[2] The procurement is a small business set-aside, set up in accordance with the Department of Treasury Acquisition Regulation (DTAR) 1019.503 and Federal Acquisition Regulation (FAR) Part 19, Small Business Programs. Plaintiff currently provides these services as the incumbent contractor under contract number TIR–93–SW–010.

The IRS conducted the procurement process under the negotiated contract method. Pursuant to 48 C.F.R. § 15.304, the solicitation incorporates a source selection technique that includes a Source Selection Plan and a Technical Evaluation Plan (TEP).[3] The TEP states that "the offeror's proposals are influenced by three major sections of the solicitation: (1) Section C—Description/ Specifications/ Work Statement; (2) Section L—Instructions, Conditions, and Notice to Offerors; and (3) Section M—Evaluation Factors for Award."[4] Section L requires that proposals contain two separate parts: one part entitled "price proposal" and the other part entitled "technical proposal."

With respect to price, the solicitation provides that the "[p]rice [p]roposal shall be submitted on Section LB, completely separate from [the][t]echnical [p]roposal, and consist of all information relevant to price of the

---

**2.** Administrative Record (A.R.) at 31.

**3.** *Id.*

**4.** *Id.* at 32.

contract line items." [5] It further states that "[a]n additional price proposal reflecting the individual elements of the pricing may be requested by the Contracting Officer, if considered appropriate." [6] The solicitation requires that the technical proposal:

shall not make reference to cost or price data, so that a technical evaluation may be made on the basis of technical merit alone. The technical portion of the proposal will be an important consideration in the award of this contract, and therefore, Offeror should provide all the information requested under Section L of the solicitation, as complete and specific as possible. [7]

Pursuant to the solicitation, the IRS established a Technical Evaluation Team (TET) to evaluate proposals consistent with sections L and M of the solicitation, and the TEP. Each technical proposal would be reviewed by all the TET members. [8] In order for a technical proposal to be acceptable and eligible for evaluation, it had to be "prepared in accordance with and comply with the instructions given in [the] solicitation document, and ... meet all the requirements set forth in the solicitation." [9] The solicitation requires the TET to evaluate technical proposals based upon four factors. Listed in order of importance, these factors include: (1) Past Performance/Experience; (2) Approach; (3) Quality Control; and (4) Contingency Plan. [10] The solicitation further provides that each of the four factors would be rated using an "adjectival scoring methodology," rating each factor as either "exceptional," "acceptable," "marginal," or "unacceptable." [11]

The solicitation specifically addresses the basis upon which defendant must award the contract:

The Government will make award to the responsible Offeror whose offer conforms to the requirements of the solicitation and is evaluated as being the most advantageous to the Government, price and other factors considered. For this solicitation, technical merit is significantly more important than price. Award will not be automatically determined by formula relationship between price and technical merit. As technical merit of the Offerors' proposals become more equal, the price may become the determining factor. The Contracting Officer shall determine what trade-off between technical merit and price promises the greatest value to the Government, price and other factors considered. [12]

Plaintiff timely submitted its price and technical proposals on June 30, 1998. Plaintiff's price proposal amounted to [* *]. On that same day, Mike Garcia Merchant Security, Inc. (MGM) submitted proposals, with its price proposal amounting to [* *]. Twelve other offerors also submitted proposals.

The TET evaluated fourteen technical proposals between July 6, 1998 and July 10, 1998. Of the fourteen proposals received, two were deemed "exceptional," one of which was MGM's. Plaintiff's proposal, along with the technical proposals of three other offerors, was rated as "acceptable." Of the remaining technical proposals, six were rated as "marginal," and two were rated as "unacceptable." The IRS removed the proposals that were rated lower than "acceptable" from the competitive range.

After establishing the competitive range, Ms. Vica Mowery, the contracting officer (CO), conducted written discussions with the offerors within the competitive range. According to defendant, the CO developed questions "to identify price increases, if any, and technical weaknesses identified by the TET." [13] Additionally, defendant maintains that it asked all the offerors the same set of questions. The CO mailed these questions to

5. *Id.* at 702.

6. *Id.* at 703.

7. *Id.*

8. The Technical Evaluation Team (TET) consisted of five Internal Revenue Service (IRS) employees with experience in contract maintenance, contract administration, and physical security.

9. *Id.* at 707.

10. *Id.* at 708.

11. *Id.* at 707–08.

12. *Id.* at 707.

13. Defendant's Statement of Facts, at 4, ¶ 15.

the offerors on July 24, 1998, wherein the offerors responded by July 30, 1998. The TET then evaluated the responses given by each offeror concerning its technical proposals. Based upon the responses received, the TET decided not to raise the technical score for either plaintiff or for MGM.

On·August 14, 1998, the CO removed two more offerors from the competitive range, reducing the total number of offerors to four. The remaining offerors included MGM, Unlimited Security, Inc. (Unlimited), Southwestern Security Services, Inc. (Southwestern), and plaintiff. In a telephonic conference held on August 16, 1998, between MGM and IRS officials, MGM responded to the IRS's questions and explained its reasons for including certain price estimates in its proposal.[14]

On August 17, 1998, IRS officials held a telephonic conference with plaintiff, in which plaintiff responded to questions concerning the inclusion of certain price elements in its proposal.[15] Significantly, the CO notified Mr. Ricky Day, the Chief Executive Officer (CEO) of plaintiff, that plaintiff's bid did not account for either the requisite number of training hours required by the solicitation or the correct number of paid holidays required by the wage determination. Mr. Day stated he would correct these deficiencies in plaintiff's final proposal. Additionally, the CO expressed her concern that plaintiff made an error in its calculation, and that she believed that plaintiff did not allocate enough money for General and Administrative (G & A) costs.

Later that day, the CO mailed letters to the four offerors, advising them that discussions were concluded and that they should submit final proposal revisions by August 25, 1998. On August 25, all offerors submitted their proposals. Plaintiff was the only offeror that did not revise its proposal. As submitted, plaintiff's bid did not account for the requisite number of paid holidays and training hours.[16] Although plaintiff did not raise its overall bid price, MGM raised its bid price to [* *]. While plaintiff's bid price was lower, it's technical proposal was considered "acceptable" because it received an "exceptional" rating in only two factors. In contrast, MGM's technical proposal was considered "exceptional" because it received an "exceptional" rating in three out of four factors.[17] The IRS considered MGM's price and technical proposals "to be the best value for the Government," due to the fact that its technical proposal was rated "excellent" and its bid price was determined to be "fair and reasonable." [18]

By letter dated September 22, 1998, the CO informed plaintiff that "the apparently successful offeror for contract award is [MGM]." [19] This was a pre-award notice given pursuant to 48 C.F.R. § 15.503(a)(2) (1998). The letter did not disclose MGM's bid price or technical scores. On that same day, Mr. Day sent the CO a letter requesting a post-award debriefing. Plaintiff received an oral debriefing from the CO on September 24, 1998.[20] During the debriefing, IRS officials disclosed to plaintiff the technical ratings it received and that its price proposal was [* *] lower than MGM's. Plaintiff was also informed that technical excellence was more important than price, and although plaintiff was the incumbent contractor, its technical proposal was not an "excellent proposal." [21] During the debriefing, plaintiff's

14. A.R. at 195–98.

15. *Id.* at 199–203.

16. *Id.* at 200, 206.

17. Specifically, plaintiff received an "exceptional" rating in the Approach and Quality Control factors and an "acceptable" rating in the Past Performance/Experience and Contingency Plan factors. MGM received an "exceptional" rating in the Approach, Quality Control, and Contingency Plan factors, but received an "acceptable" in the Past Performance/Experience factor. *Id.* at 353.

18. *Id.* at 353.

19. *Id.* at 503.

20. A memorandum documenting the debriefing states that "although the contract was not officially awarded, a post-award debriefing was conducted via [telephonic conference] among the above participants." *Id.* at 206.

21. *Id.*

counsel advised IRS officials that he would file a bid protest because the IRS failed to conduct meaningful discussions with plaintiff regarding the Past Performance/Experience factor.[22] Although IRS officials disagreed, they nevertheless decided to reopen discussions with the four offerors, giving each an opportunity to revise its proposals. MGM did not object to this decision.

On September 25, 1998, the CO notified the four offerors by letter that negotiations had been reopened and would be conducted during the week of September 28, 1998. On October 14, 1998, the CO mailed a letter to each offeror that identified items the IRS would discuss with that particular offeror during negotiations. The CO's letters to plaintiff and MGM differed. Although both letters offered each offeror the opportunity to improve its technical and price proposals, plaintiff's letter included an additional eight questions for it to address.[23] Significantly, the letter repeated questions that the CO asked plaintiff during the first round of negotiations.

On October 15, 1998, IRS officials held a new round of discussions with MGM via a telephonic conference. During the telephonic conference, IRS officials told MGM that it was possible to improve its technical rating in the area of Past Performance/Experience from "acceptable" to "exceptional." More importantly, they notified MGM of its standing in the competitive range regarding its price proposal: "[w]ith regard to price, [you] are on the lower end, but not the lowest priced offeror. Any revisions with regard to price must be submitted in writing along with an explanation for revisions."[24] The IRS did not address any questions to MGM regarding its price proposal.

On October 16, 1998, IRS officials held a telephonic conference with plaintiff, in which they discussed some of the questions posed to plaintiff in the CO's letter dated October 14, 1998. They also told plaintiff that it was "on the low end of the competitive range."[25] Plaintiff was given the opportunity to submit a revised price and technical proposal by October 21, 1998.

On October 21, 1998, the IRS received revised proposals from all four offerors. Plaintiff submitted a revised technical proposal, but did not revise its price proposal. Included with its final proposal was a letter addressed to the CO, in which plaintiff answered the questions posed by the IRS. Specifically, Mr. Day stated "again [plaintiff] recognizes all associated costs and is quite satisfied with our bid as submitted."[26] MGM submitted a revised price proposal lowering its price to [* *]. MGM also submitted a revised technical proposal. In addition, Unlimited and Southwestern submitted revised price proposals.

On October 28, 1998, the TET evaluated the offerors' revised technical proposals. After reviewing plaintiff's proposal, the TET raised plaintiff's rating in the Contingency Plan factor to "exceptional," thereby raising plaintiff's overall technical score to "exceptional." In contrast, after reviewing MGM's revised technical proposal, the TET decided MGM's proposal did not warrant raising MGM's technical score.[27]

Upon completion of the reopened negotiations, the TET determined that, because all the offerors were rated technically "exceptional," they should be treated as technically equal.[28] With regard to price, however, MGM's price proposal was the lowest. According to defendant, because each element of MGM's proposal was relevant and reasonable, the TET determined that MGM was the best value for defendant.[29]

On November 16, 1998, the IRS awarded the contract to MGM. In a letter sent that same day, the CO notified plaintiff that the IRS awarded MGM the contract because

22. *Id.*

23. *Id.* at 210.

24. *Id.* at 216.

25. *Id.* at 219.

26. *Id.* at 290.

27. *Id.* at 713.

28. *Id.* at 713.

29. *Id.*

MGM's price was lower than plaintiff's. Also on that same day, plaintiff requested a post-award debriefing. On November 19, 1998, the CO sent plaintiff a written debriefing. In her letter, the CO informed plaintiff that both MGM's and plaintiff's technical proposals were evaluated as "exceptional," and because both offers were technically equal, price was the determining factor in the award decision.[30] MGM's price was lower, and thus the IRS awarded it the contract.

After reviewing the written debriefing, plaintiff requested an oral clarification from the CO. Plaintiff asserts that during a telephonic conference with IRS officials, plaintiff was informed of the IRS's discussions with MGM regarding the overall price range. Specifically, IRS officials told plaintiff that they notified MGM that it "was on the lower end of the competitive range, but not the lowest priced offeror." [31]

On November 23, 1998, plaintiff filed suit in this court seeking a temporary restraining order (TRO) and motion for a preliminary injunction, asserting that defendant's discussions with MGM were improper and violated the Competition in Contracting Act, 41 U.S.C. § 253b(d)(3) (1994). During a telephonic conference held with the parties [32] on November 25, 1998, defendant informed the court that the IRS would delay performance of the contract until February 15, 1999.[33] The court thus found plaintiff's motion for a TRO and preliminary injunction as moot. On January 8, 1999, plaintiff filed its motion for summary judgment on the administrative record, alleging that defendant's discussions with the offerors violated the Procurement Integrity Act, 41 U.S.C. § 423, and several procurement regulations, thereby prejudicing plaintiff. On that same date, defendant filed its motion for summary judgment, alleging that it engaged in discussions with MGM concerning price to make the procurement process more fair, and its actions were permitted by procurement regulations. The court heard oral arguments on the parties' motions on January 25, 1999.

### Discussion

Motions for judgment upon the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1; *see Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary of Dept. of Health & Human Services,* 998 F.2d 979, 982 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.

---

**30.** *Id.* at 229.

**31.** Plaintiff's Proposed Findings of Uncontroverted Fact (PFOF), at 7, ¶ 19. *See also* A.R. at 216.

**32.** MGM was given the opportunity to intervene, but elected not to participate.

**33.** Defendant subsequently informed the court that the IRS would delay implementation of performance until March 1, 1999.

1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)). Summary judgment will not necessarily be granted to one party or another simply because both parties have moved for summary judgment. *Corman v. United States,* 26 Cl.Ct. 1011, 1014 (1992) (citing *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692–93 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States,* 33 Fed.Cl. 514, 518 (1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman,* 26 Cl.Ct. at 1014).

Congress amended the Tucker Act in 1996 by granting this court jurisdiction to hear post-award bid protest actions. 28 U.S.C. § 1491(b)(1) (Supp. II. 1996). The court reviews the challenged agency decisions according to the standards set out in the Administrative Procedures Act (APA), 5 U.S.C. § 706 (1994). Thus, the court must determine whether defendant's actions toward plaintiff were:

(A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law . . . .

5 U.S.C. § 706(2).

■ In determining whether the agency has acted arbitrarily or capriciously towards plaintiff, the court must consider four factors. *Keco Indus., Inc. v. United States,* 203 Ct.Cl.

566, 492 F.2d 1200, 1203 (1974). Specifically, the court must determine whether: (1) there was subjective bad faith on the part of procurement officials; (2) there was not a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated. *Id.* at 1203–04; *Metric Sys. Corp. v. United States,* 42 Fed.Cl. 306, 310 (1998). There is, however, "no requirement or implication . . . that each of the factors must be present in order to establish arbitrary and capricious action by the Government." *Prineville,* 859 F.2d at 911. Plaintiff must demonstrate by clear and convincing evidence that defendant's actions towards it were arbitrary and capricious. *United Int'l Investigative Servs. v. United States,* 41 Fed.Cl. 312, 318 (1998) (citing *ECDC Envtl., L.C. v. United States,* 40 Fed. Cl. 236, 241 (1998)).

■ Furthermore, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996); *see also Central Ark. Maintenance, Inc. v. United States,* 68 F.3d 1338, 1342 (Fed.Cir.1995) (only clear and prejudicial violations warrant relief). "This requires proof that, had it not been for the statutory or regulatory violation, 'there was a reasonable likelihood that the protestor would have been awarded the contract.'" *Candle Corp. v. United States,* 40 Fed.Cl. 658, 665 (1998) (quoting *Data Gen. Corp.,* 78 F.3d at 1562); *see also Day & Zimmermann Servs. v. United States,* 38 Fed.Cl. 591, 597; *Hydro Eng'g, Inc. v. United States,* 37 Fed.Cl. 448, 471. To obtain injunctive relief, in addition to proving a likelihood of success on the merits, plaintiff must make three additional showings: (1) that it will suffer irreparable harm if injunctive relief is not awarded; (2) that granting relief serves the public interest; and (3) that the harm to be suffered by it outweighs the harm to the Government and third parties. *United Int'l Investigative Servs.,* 41 Fed.Cl. at 323 (citing *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir. 1993)).

When reviewing agency action, the APA requires a "thorough, probing, indepth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Contracting officials may properly exercise wide discretion in their evaluation of bids and the application of procurement regulations. *Electro–Methods, Inc. v. United States,* 7 Cl.Ct. 755, 762 (1985); *see RADVA Corp. v. United States,* 17 Cl.Ct. 812, 818 (1989), *aff'd without op.,* 914 F.2d 271 (Fed.Cir.1990). This discretion is especially broad in negotiated procurements, such as the one involved in the present case. *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 725 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988). In this regard, the court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 83 (1998). Indeed, "[t]he court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). As long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

The scope of review of the agency's actions is limited to the administrative record developed by the agency. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). The court, however, may allow the parties to supplement the administrative record in certain limited situations. *Aero Corp., S.A. v. United States,* 38 Fed.Cl. 408, 411 (1997). Specifically, the court may consider "extra-record" evidence:

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997) (quoting *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989)).

In the present case, the court permitted plaintiff to conduct a deposition of the CO. The court directed that this deposition be limited to: (1) the structure of the administrative record and relationship of documents contained therein; and (2) the factual extent of the telephonic conference held between the IRS and MGM on October 15, 1998. *See DGS Contract Servs. v. United States,* No. 98–891C (Fed.Cl. Dec. 18, 1998) (order granting limited discovery). The deposition occurred on December 22, 1998.

Plaintiff argues that information concerning the price range constitutes source selection information, and defendant's revelation of that information violated the Procurement Integrity Act, 41 U.S.C. § 423, as well as 48 C.F.R. §§ 3.104–4 and 15.306(e) (1998). Moreover, plaintiff contends this information may not be disclosed under 48 C.F.R. § 15.507 (1998), because that provision only permits the disclosure of debriefing information relating to the successful offeror's proposals. Defendant acknowledges that information concerning price range constitutes source selection information, but asserts that the CO has authority to disclose that information under the Procurement Integrity Act. Moreover, defendant alleges that it was required by 48 C.F.R. § 15.507 to reveal to the other offerors information provided to plaintiff in the debriefing. According to de-

fendant, plaintiff knew MGM's price and technical score, thereby placing plaintiff at a competitive advantage. Thus, defendant avers it told each offeror where it stood in the price range to create a "level playing field."[34]

The Procurement Integrity Act provides that "a person [who is acting on behalf of the United States] shall not, other than as provided by law, knowingly disclose contractor bid or proposal information or source selection information before award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 423(a). The term "person" includes any present or formal official of the United States. *Id.* Source selection information includes "any information prepared for use by a federal agency for the purpose of evaluating a bid or proposal to enter into a Federal agency procurement contract, if that information has not been previously made available to the public or disclosed publicly." 41 U.S.C. § 423(f)(2). Specifically included within the definition of source selection information are "bid prices," "proposed costs or prices" and "ranking of bids, proposals or competitors." *Id.*

The administrative record contains ample evidence that the agency ranked the bidders according to price and technical proposals. It can be assumed that defendant used these price rankings as a basis for telling each offeror during reopened negotiations its placement in the price range. Because the discussions of price range originated from the IRS's own ranking materials, the court finds that these discussions constitute "a ranking of bids," thereby falling within the definition of source selection information.

Plaintiff's assertion that source selection information may never be disclosed during the procurement process is unpersuasive. Although source selection information generally may not be disclosed, the statute includes an exception to that general rule: "[t]his section does not ... restrict the disclosure of information to, or its receipt by, any person or class of persons authorized, in accordance with applicable agency regulations or procedures, to receive that informa-

tion." 41 U.S.C. § 423(h)(1). The FAR discusses persons authorized to disclose this information:

> Except as specifically provided for in this subsection, no person or other entity may disclose contractor bid or proposal information or source selection information to any person other than a person authorized, in accordance with applicable agency regulations or procedures, by the head of the agency or designee, or the contracting officer, to receive such information.

48 C.F.R. § 3.104–5 (1998). These provisions make clear that the CO is authorized to disclose source selection information under certain circumstances.

FAR § 15.506(d) (1998) permits the CO to release source selection information to an unsuccessful offeror within a post-award debriefing. This section states that a debriefing must include, among other things: (1) the Government's evaluation of the significant weaknesses or deficiencies in the offeror's proposal, if applicable; (2) the overall evaluated cost or price (including unit prices), and technical rating, if applicable, of the successful offeror and the debriefed offeror, and past performance information on the debriefed offeror; and (3) the overall ranking of all offerors, when any ranking was developed by the agency during the source selection. 48 C.F.R. § 15.506(d).

Neither party disputes that plaintiff properly received this information via 48 C.F.R. § 15.506. Moreover, the parties agree that the CO properly reopened negotiations. The dispute in the present case involves what occurred after the CO reopened negotiations, i.e., the CO's disclosure of limited price range information to all of the offerors in the competitive range. Thus, the court must determine whether the CO's disclosure of price range information violated 41 U.S.C. § 423(a).

The parties dispute whether defendant was required by 48 C.F.R. § 15.507 to reveal this source selection information. This section provides, in pertinent part:

---

**34.** Defendant's Motion for Summary Judgment on the Administrative Record, at 10.

(b) If a protest causes the agency, within one year of the contract award, to—

. . . .

(2) Issue a new request for revised proposals on the protested contract award, the contracting officer shall provide the information in paragraph (c) of this section to offerors that were in the competitive range and are requested to submit revised proposals.

(c) The following information will be provided to the appropriate parties:

(1) Information provided to unsuccessful offerors in any debriefings conducted on the original award regarding the successful offeror's proposal; and

(2) Other nonproprietary information that would have been provided to the original offerors.[35]

The court, however, need not address the merits of this argument, for it finds that this regulation does not apply. The plain language of the regulation requires that there be a contract award. In the present case, there was no such contract award. Specifically, the administrative record provides that a pre-award notice was given to plaintiff. A memorandum documenting the debriefing held on September 24, 1998, states "the contract was not officially awarded." [36] On that same day, the IRS decided to reopen negotiations. Moreover, there is no evidence that a contract was officially awarded between the time plaintiff received its pre-award notice and the time it received its debriefing. Similarly, there is no evidence in the record that MGM began performance on the contract. Furthermore, even if there had been an "award," the IRS's act of reopening negotiations voided that "award," and therefore 48 C.F.R. § 15.507 is inapplicable. *See Fore Sys. Fed., Inc. v. United States,* 40 Fed.Cl. 490, 491 (1998) (finding no contract award when the agency issued a resolicitation, and thus 48 C.F.R. § 15.507 did not apply).

Nevertheless, the court's decision regarding the applicability of 48 C.F.R. § 15.507

does not lead to the conclusion that the CO was prohibited from disclosing this information. In *KPMG Peat Marwick,* 73 Comp. Gen. 15 (1993) *mot'n for reconsid. den'd, Agency for Int'l Dev.,* B–251902.4, 1994 WL 91072 (Comp.Gen.1994), KPMG, through a Freedom of Information Act (FOIA) request, obtained score sheets, rankings of offerors, narrative evaluation comments, and other materials. *Id.* at 18. The agency subsequently determined that it improperly awarded the contract, and decided to reopen the competition. *Id.* Concluding that KPMG held a competitive advantage by virtue of the FOIA information it possessed, the agency excluded KPMG from the reopened competition. *Id.* at 18–19.

KPMG filed a protest, and the Comptroller General determined that the appropriate remedy was to disclose the information that KPMG received to all the offeror in the competitive range. *Id.* at 21. Upon a motion for reconsideration, the Comptroller General, although acknowledging KPMG received source selection information, held that this material fell within the category of materials that the Government may waive its right to protect. *Agency for Int'l Dev. (AID),* B–251902.4, 1994 WL 91072, at 4 (Comp.Gen.1994). The Comptroller General further held "the procurement integrity provisions of the Office of Federal Procurement Policy (OFPP) Act recognized that source selection information may be released during the conduct of a procurement as authorized by the contracting officer or head of the agency." *Id.* (citing 41 U.S.C. § 423(b)(3), (d) (1988 and Supp. IV 1992); FAR § 3.104–5(d) (1993)).

In fact, the Comptroller General has upheld agency decisions to release prices of all competitors as an appropriate remedial action when one competitor obtained the "awardee's" prices in a debriefing and the agency properly reopened negotiations. *See Sperry Corp.,* 65 Comp. Gen. 715, 716–17 (1986); *Cowperwood Co.,* B–274140.2, 96–2 CPD ¶ 240, at 2 (Comp.Gen.1996) ("the dis-

---

**35.** 48 C.F.R. § 15.507 (1998). FAR Part 15 was revised in 1997 and became effective on October 10, 1997. Agencies, however, were permitted to delay the implementation of the new Part 15

until January 1, 1998. *See* 62 Fed.Reg. 51224 (Sept. 30, 1997).

**36.** A.R. at 206.

closure of information to equalize competition is an appropriate alternative to eliminating an offeror from a competition due to a prior disclosure of information that could result in an unfair competitive advantage") (quoting *KPMG Peat Marwick*, 73 Comp. Gen. 15); *cf. Unisys Corp., Inc.*, 67 Comp. Gen. 512, 515 (1988) (disclosure of all offerors' proposal costs and award fees to offset any competitive advantage gained by the competitors' receipt of notice of award that included "awardee's" prices was proper).

■ While the decisions of the Comptroller General are not binding, the court recognizes that the General Accounting Office has special expertise in this area, and its decisions may provide useful guidance to the court. *Advanced Distribution Sys., Inc. v. United States*, 34 Fed.Cl. 598, 604 n. 7 (1995); *Logicon, Inc. v. United States*, 22 Cl.Ct. 776, 786 (1991). The court finds the reasoning behind these Comptroller General decisions persuasive. These decisions make clear that when an unsuccessful offeror lawfully obtains source selection information, such as a competitors prices and technical scores, and the agency subsequently properly reopens negotiations, the agency may disclose similar information to all the competitors to eliminate any competitive advantage obtained.

■ The Competition in Contracting Act requires the agency to "obtain full and open competition through the use of competitive procedures in accordance with the requirements of this subchapter and the [FAR]." 41 U.S.C.A. § 253(a)(1)(A) (West Supp.1998). The CO must ensure that contractors receive impartial, fair and equitable treatment. 48 C.F.R. § 1.602–2 (1998). Moreover, it is "a bastion of federal procurement policy that all offerors must possess the equal knowledge of the same information to have a valid procurement." *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed.Cir.1995) (citing *Logicon*, 22 Cl.Ct. at 788). "All offerors cannot have equal knowledge if one knows the previous bid of another." *Id.* The court is cognizant of the fact that "[c]ontracting officials in negotiated procurements have broad discretion to take corrective action where the agency determines that such action is necessary to ensure fair and impartial competition." *Rockville Mailing Serv., Inc.*, B–270161.2, 96–1 CPD ¶ 184, at 4 (Comp.Gen.1996).

■ Based upon these principles and the Comptroller General decisions cited, the court finds that the CO could take some form of corrective action provided it was reasonable under the circumstances. In the present case, if defendant were prohibited from sharing the source selection information with all the offerors in the competitive range, plaintiff would retain a competitive advantage. Indeed, plaintiff would be the only offeror with knowledge of: (1) MGM's bid price (and thus the exact price it needed to outbid in reopened negotiations); (2) MGM's technical ratings; and (3) its price ranking in relation to MGM. Consequently, the court finds that the CO's informing all the offerors that they were in the high or low end of the competitive range was a reasonable means of serving to reduce the competitive advantage held by plaintiff. The CO merely disclosed information similar to that obtained by plaintiff in its debriefing.

The court is further convinced the CO's decision was reasonable because there is no evidence that the CO acted in bad faith. *See Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 617 F.2d 590, 597 (1980) (absence of bad faith gives credence to a reasonableness determination). Moreover, the record is devoid of any evidence that the IRS expected to reopen negotiations. In fact, the parties agree that the CO properly reopened negotiations. Accordingly, given the facts of this case and the broad discretion granted to procurement officials, the court finds that the CO conducted these discussions to level the playing field and promote competition, and as such, her actions were not arbitrary and capricious.[37]

---

37. Plaintiff also asserts that defendant could have "leveled the playing field" without discussing price range and performed "touch-up" negotiations as discussed in *Logicon, Inc. v. United States*, 22 Cl.Ct. 776, 786 (1991), and *Data Sys. Div. of Litton Sys.*, B–208241, 82–2 CPD ¶ 297 (1982). Alternatively, plaintiff asserts that pursuant to *Honeywell Info. Sys.*, 56 Comp. Gen. 505 (1977), defendant can not reveal price range information without consent of each offeror. While these alternatives may be reasonable, the court cannot substitute its judgement for the

Plaintiff also avers that defendant's discussions with the offerors regarding relative standing in the price range amounted to an illegal "one-sided auction." [38] Plaintiff asserts that although the new FAR Part 15 does not expressly prohibit the use of auction techniques, a reasonable interpretation of regulatory history of the Part 15 revisions provides that the drafters intended to prohibit their use. Defendant asserts that no auction took place and that there is no provision in the FAR that specifically prohibits auctions.

▪ This issue can be resolved by interpretation of the regulation. Principles of statutory interpretation apply to the interpretation of regulations. *Trustees of Ind. Univ. v. United States*, 223 Ct.Cl. 88, 618 F.2d 736, 739 (1980). To construe a statute, the courts begins by examining the language to determine the plain meaning of the words used. *Bazalo v. West*, 150 F.3d 1380, 1382 (Fed.Cir.1998). "Absent a clearly expressed legislative intention to the contrary, a statute's plain meaning must ordinarily be regarded as conclusive." *Astra v. Lehman*, 71 F.3d 1578, 1580 (Fed.Cir.1995) (citing *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)). Therefore, if the language of the statute is unambiguous, it controls, and the court's inquiry is at an end. *Angus Chem. Co. v. United States*, 140 F.3d 1478, 1484 (Fed.Cir.1998); *Hemscheidt Corp. v. United States*, 72 F.3d 868, 871 (Fed.Cir. 1995).

▪ The pre-revision FAR Part 15 specifically addressed the use of certain auction techniques:

(e) The following conduct may constitute prohibited conduct under section 27 of the Office of Federal Procurement Policy Act, as amended (41 U.S.C. § 423), and subpart 3.104 . . . .

(2) Auction techniques, such as—

(i) Indicating to an offeror a cost or price that it must meet to obtain further consideration;

(ii) Advising an offeror of its price standing relative to another offeror (however, it is permissible to inform an offeror that its cost or price is considered by the Government to be too high or unrealistic); and

(iii) Otherwise furnishing information about other offerors' prices.

48 C.F.R. § 15.610 (June 1997).

During the 1997 revisions of FAR Part 15, section 15.610 was removed. The section that replaced it provides that "Government personnel involved in the acquisition shall not engage in conduct that . . . reveals an offerors [sic] price without that offerors [sic] permission." 48 C.F.R. § 15.306(e) (1998). The CO, however, "may inform an offeror that its price is considered by the Government to be too high, or too low, and reveal the results of the analysis supporting that conclusion." *Id.*

Nothing in the plain language of section 15.306(e) explicitly prohibits the use of auction techniques. *See Nick Chorack Mowing*, B–280011.2, 98–2 CPD ¶ 82, at 3 (Comp.Gen. 1998) ("while the predecessor Part 15 included constraints on the Government's use of 'auction techniques', FAR § 15.610(e) (June 1997), the rewrite does not contain such a provision"). Construing section 15.306(e), an agency theoretically could conduct an auction and disclose prices of each offeror in the competitive range provided it obtained their consent. *See* JOHN CIBINIC, JR. AND RALPH C. NASH, JR., FORMATION OF GOVERNMENT CONTRACTS, p. 892 (3rd ed.1998) ("it would not be improper for the agency to conduct an auction provided that it received the permission of all offerors to have their prices disclosed").

The court finds that no auction took place in the present case. The court has defined the term auction as "direct bidding of price between two competing offerors." *M.W. Kellogg Co./Siciliana Appalti Costruzioni, S.p.A. v. United States*, 10 Cl.Ct. 17, 24 (1986). There was no direct price bidding in this case. The CO did not reveal plaintiff's

---

decision of the CO, particularly when her actions in the present case were reasonable.

38. Oral Argument Transcript at 15.

prices to MGM.[39] Additionally, the court has found no evidence that defendant disclosed any prices during the reopened negotiations. All offerors were told their respective placement in the price range and were given the opportunity to revise their price proposals. Plaintiff was the only offeror that chose not to revise its price proposal. Even if the CO had disclosed prices, the Comptroller General has held that such action does not constitute an auction. *See Rockville Mailing Serv., Inc.*, B–270161.2, 96–1 CPD ¶ 184, at 3 (Comp.Gen.1996) (when original awardee's price was disclosed, and negotiations were properly reopened, the agency's disclosure of all the offeror's prices as a remedial action did not constitute an improper auction). Accordingly, the court finds that the CO's discussions with the offerors concerning the price range did not constitute an auction.

· Plaintiff also asserts that during reopened negotiations the CO conducted prejudicially misleading discussions in violation of 48 C.F.R. § 15.306(e)(1). Specifically, plaintiff alleges that the CO, during reopened negotiations, repeated the same questions it asked plaintiff before reopening negotiations, in an effort to convince plaintiff to increase its bid price. According to plaintiff, the CO simultaneously sought to drive down MGM's price by providing it with certain "price cues."[40] Plaintiff also posits that it was treated unfairly because the government informed plaintiff that it was missing certain cost elements in its proposal, but it told the other offerors that their price proposals included all the necessary cost elements. Defendant argues that the IRS neither asked plaintiff to increase its bid price nor sought to convince plaintiff to do so. Moreover, defendant asserts that these questions are consistent with

the types of questions called for by the price realism clause in the solicitation, and alleges that the administrative record demonstrates that defendant asked plaintiff and MGM the same questions.

■■■ The FAR provides that "Government personnel involved in the acquisition shall not engage in conduct that ... [f]avors one offeror over another." 48 C.F.R. § 15.306(e)(1). It is well-established, however, that contracting officials are presumed to act in good faith when executing their procurement functions. *Cincom Sys., Inc. v. United States*, 37 Fed.Cl. 663, 671 (1997) (citing *Finley v. United States*, 31 Fed.Cl. 704, 706 (1994), *appeal dismissed*, 50 F.3d 21 (Fed.Cir.1995)). Indeed, a plaintiff must establish well-nigh irrefragable proof to induce the court to abandon the presumption of good faith dealing. *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976) (citing *Knotts v. United States*, 128 Ct.Cl. 489, 121 F.Supp. 630, 631 (1954)).

■■■ There is no evidence that defendant treated plaintiff any differently than MGM when it asked plaintiff certain questions during discussions. Pursuant to the FAR, the CO "is responsible for obtaining information that is adequate for evaluating the reasonableness of the price or determining cost realism." 48 C.F.R. § 15.403–3(a)(1) (1998). In addition, the price realism clause contained within the solicitation requires that "price proposals ... be evaluated to ensure they are ... reasonable and realistic."[41] The administrative record provides that the IRS developed standard questions to discuss price elements of the offerors' price proposals.[42] It is clear the IRS developed these questions as an aid in assessing price realism.[43] The administrative record provides

---

**39.** *See* PFOF, Ex. 1, at 32, 40, 42.

**40.** Plaintiff's Motion for Summary Judgment at 17.

**41.** A.R. at 712. The full text of the price realism clause reads:

Price proposals will be evaluated to ensure that they are competitive, reasonable, and realistic. The following factors form the basis for price evaluation.

(A) Reasonableness, realism, and appropriateness of the burdened rates, based on comparison with other offers received and with

existing contracts utilized by the IRS for the acquisition of same/similar services.

(B) Reasonableness and realism of the proposed annual escalation factor.

(C) The extent to which the proposal appears generally properly stated and well documented.

**42.** *Id.* at 724.

**43.** In fact, in a letter dated July 24, 1998, the CO stated "to determine reasonableness and realism on your price proposal pursuant to Section M.4 of the Solicitation, please provide a detailed

that defendant asked plaintiff and MGM these standard questions. Hence, this fact alone negates plaintiff's claim.[44]

The court finds unpersuasive plaintiff's claim that it was treated unfairly during reopened negotiations because it was the only offeror told that its proposal was lacking certain cost elements.[45] The FAR requires the CO to indicate or discuss with each offeror still being considered for award "significant weaknesses, deficiencies, and *other aspects of its proposal* (such as cost, price, technical approach, past performance, and terms and conditions) that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award." 48 C.F.R. § 15.306(d)(3) (emphasis added). Additionally, the "scope and extent of discussions are a matter of [the CO's] judgment." *Id.* Moreover, "[d]iscussions are tailored to each offeror's proposal." 48 C.F.R. § 15.306(d)(1). It therefore does not follow that plaintiff was treated unfairly simply because the CO reasonably believed plaintiff's proposal might be lacking certain cost elements, while other offeror's proposals might not.

Plaintiff has failed to prove by clear and convincing evidence that defendant either asked plaintiff to increase its bid price or sought to induce plaintiff to do so. In fact, plaintiff has merely points to the questions posed by the CO and asks the court to infer defendant's intent in asking them. For example, during the first round of negotiations, Mr. Day acknowledged that plaintiff's bid did not account for the requisite number of paid holidays required by the wage determination, or the correct number of guard training hours required by the solicitation.[46] The administrative record provides that plaintiff failed to make these corrections.[47] Thus, the court holds that the CO had a reasonable basis to ask these questions, particularly because the solicitation requires the Government to award the contract to the "[o]fferor whose offer conforms to the requirements of the solicitation." [48]

The court also finds no merit in plaintiff's claim that the CO's request for a breakdown of walk time and G & A costs was an implicit attempt to drive plaintiff's bid price higher. During the initial site visit held on June 4, 1998, the CO informed all prospective offerors that the Department of Labor "[was] very adamant about the guards being paid walk time," and thus "the contractor is responsible for [walk time]." [49] An August 17, 1998 price negotiation memorandum clearly demonstrates that the CO was concerned that plaintiff's price proposal did not account for walk time and that plaintiff's G & A costs might not cover the expenses to which plaintiff had allocated G & A.[50] The court does not find the CO's questions concerning walk time and G & A costs were implicit attempts to drive up plaintiff's bid price. Rather, and pursuant to the solicitation, the CO could request "an additional proposal reflecting the individual elements of the pricing." [51] Additionally, one factor in the determination of price realism is the extent to which the proposal is well documented. Requesting additional documentation certainly would have assisted the CO in determining price reasonableness. Accordingly, the court holds that the CO did not act arbitrarily or capriciously

---

price proposal that includes a complete breakdown on how the price was derived." *Id.* at 375.

**44.** These questions related to: (1) turnover rate; (2) uniform cleaning; (3) disposition of vehicles; (4) whether the offeror accounted for eleven paid holidays in its proposal; (5) vacation time based upon years in service; (6) percentage of profit; (7) walk time labor costs; (8) relief hours; (9) elements of overhead costs; (10) elements of other direct costs; (11) elements of G & A costs; (12) payment of shift differential; and (13) training hours. *Id.* at 195–203.

**45.** Plaintiff's Memorandum of Law Concerning Proprietary Information, at 10. Specifically, plaintiff asserts that defendant told plaintiff that "its price was lacking in required cost elements," while it told MGM, [Unlimited] and [Security] that their "price[s] included all the required [cost] elements." *Id.*

**46.** *Id.* at 200–01.

**47.** *Id.* at 200, 286.

**48.** *Id.* at 707.

**49.** *Id.* at 133–34.

**50.** *Id.* at 200.

**51.** *Id.* at 702–03.

in asking for a breakdown of walk time and G & A costs.

## Conclusion

The court concludes that defendant's act of disclosing limited price range information did not violate the Procurement Integrity Act or 48 C.F.R. § 15.306. As such, the court finds defendant's actions were not arbitrary and capricious. Moreover, the court finds that defendant neither engaged in an auction nor conducted prejudicially misleading discussions. Accordingly, plaintiff's motion for summary judgment and permanent injunction is denied, and defendant's cross-motion for summary judgment is granted. The clerk is directed to dismiss plaintiff's complaint. No costs.

