MANTECH TELECOMMUNICATIONS
AND INFORMATION SYSTEMS
CORP., Plaintiff,

v.

The UNITED STATES, Defendant,

v.

Lockheed Martin Services,
Inc., Intervenor.

No. 00–579C.

United States Court of Federal Claims.

Filed Under Seal Feb. 15, 2001.

Published March 30, 2001.[1]

1. An unredacted version of this opinion was issued under seal on February 15, 2001. The opinion published today incorporates the parties' jointly proposed redactions. This redacted material is represented by brackets [ ].

Devon E. Hewitt, Shaw Pittman, McLean, Virginia, attorney of record for plaintiff.

Timothy P. McIlmail, U.S. Department of Justice, Washington, D.C., with whom was Major Paul Salussolia, U.S. Army Litigation Division, and Assistant Attorney General David W. Ogden, for defendant.

C. Stanley Dees, McKenna & Cuneo, L.L.P., Washington, D.C., attorney for Lockheed Martin Services, Inc., intervenor.

## OPINION

ALLEGRA, Judge.

This bid protest action is before the court on the parties' cross-motions for judgment on the administrative record. Plaintiff avers that prejudicial errors occurred during the selection process involving the solicitation in question. At issue is whether corrective action proposed by the defendant in response to those alleged errors is arbitrary, capricious or otherwise contrary to law. After careful consideration of the briefs filed by the parties, the extensive oral argument, and for the reasons discussed below, the court **GRANTS, IN PART,** and **DENIES, IN PART,** plaintiff's motion for judgment on the administrative record and **GRANTS, IN PART,** and **DENIES, IN PART,** defendant's cross motion for judgment on the administrative record. The court further concludes that plaintiff is entitled to injunctive relief, albeit more limited than requested, as described below.

## I. FACTS

On February 17, 2000, the United States Department of the Army, Headquarters, Intelligence and Security Command (Army or INSCOM) issued Request for Proposals (RFP) No. DASC01–00–R–0002 (the Solicitation). The procurement, *inter alia*, consolidated two prior INSCOM contracts, TROJAN and TROUBLESHOOTER, held by ManTech Telecommunications & Information Systems Corporation (ManTech) and Raytheon Technical Services Company, respectively, with a third National Security Agency contract held by Lockheed Martin Services, Technical Operations (Lockheed Martin). With an estimated value of nearly $100 million, the Solicitation contemplated the award of a single time and material requirements contract, the GENESIS contract, for an estimated four month phase-in period, a one-year base period, and four one-year option ordering periods. It envisioned that the contractor would receive various task orders to provide operational, program management, technical, design, engineering, integration, prototype development and fabrication, and fielding and logistics support at various Army sites across the United States and abroad, including critical sites in Germany, Korea, Kuwait, Bosnia and Sarajevo.

Four major factors were to be considered in evaluating offeror proposals: technical, management, past performance and price proposals. According to the Solicitation, the technical factor was "significantly" more important than the management factor, which, in turn, was entitled to more weight than the past performance factor. The Solicitation indicated that cost would be considered, but emphasized that factor was "significantly less important" than the other three. The Solicitation further added that "cost realism" would be "an inherent consideration in the review of all proposals." [2] It indicated that the GENESIS contract award would be made to the responsible offeror whose proposal was determined by the Government to represent the "best value" to the Government, cost and other factors considered.

With respect to technical proposals, the Solicitation instructed offerors to address three evaluation factors: Technical Approach (Factor A), Sample Tasks (Factors B–J) and Technical Skills, Qualifications and Experience of the proposed personnel (Factor K). Regarding the last of these factors, offerors were to provide resumes for eighteen key personnel, for which position descriptions were contained in the Solicitation identifying "the minimum acceptable personnel qualifications." Offerors were warned that resumes that did not "clearly illustrate that the total experience and educational requirements have been met will not be accepted." [3]

Regarding cost proposals, the Solicitation instructed offerors to propose "fully-loaded" hourly rates for each labor category and each ordering period set forth on a chart append-

2. In explaining this "cost realism" analysis, the Solicitation stated:

> The proposal is presumed to represent the offeror's best effort to respond to the solicitation. Any inconsistency, whether real or apparent, between the proposed performance and cost must be explained in the proposal. Any significant unexplained inconsistency may raise a fundamental question of the offeror's understanding of the nature and scope of work to be required. The burden of proof as to cost credibility rests with the offeror. Cost realism shall be an inherent consideration in the review of all proposals. Under certain circumstances to include when two or more technical proposals are substantially equal, award may be made to the offeror whose proposal is the best value to the government considering both technical and cost elements.

*See also* 48 C.F.R. § 15.305(a)(1) (2000) (indicating that a "cost realism analysis" may be used "to determine what the Government should realistically expect to pay for the proposed effort, the offeror's understanding of the work, and the offeror's ability to perform the contract").

3. According to the Source Selection Plan, technical proposals would receive adjectival ratings based on the number of proposed candidates who possessed the minimum qualifications. Thus, an offeror would receive a rating of "Excellent" if, "[a]ll of the Offeror's key personnel exceed the minimum education and years of experience requirements;" "Good" if "[t]he majority of the Offeror's key personnel meet the minimum education and years of experience requirements;" "Poor" if "[s]ome of the offeror's key personnel meet minimum education and years of experience requirements;" and "Unacceptable" if "[t]he vast majority of the Offeror's key personnel do not meet the minimum education or years of experience requirements." However, none of this rating information was contained in the Solicitation itself.

ed to Section B of the Solicitation, designated "Labor Rate Chart A." According to the Solicitation, this hourly rate was to consider "teaming/subcontracting and the various skill levels of workers to be utilized for task accomplishment at any of the identified sites." The chart contained sixty labor categories with estimated hours for each position for the phase-in, base, and four option periods. The Solicitation emphasized that the hours shown on the chart were "government estimates" and "do not necessarily represent the actual hours that may be required to perform Task Orders at any of the sites." A total contract price evaluation, as well as cost ceilings for each contract line item (CLIN) at contract award, was to be determined by multiplying the proposed hourly rates by the estimated hours. The Solicitation also included a CLIN for "Other Direct Costs (ODCs)" to cover such things as relocation, housing allowances, cost of living allowances, hazard duty pay, pay for work outside the continental United States sites, as well as travel, training, emergency purchases, office space, and quick reaction capability for all sites. However, the Solicitation also made clear that these costs would not be evaluated in assessing the price of the proposal.

Only ManTech and Lockheed Martin submitted offers in response to the Solicitation. ManTech's cost proposal utilized [ ] to provide qualified professionals at [ ] rates that it viewed as including realistic labor rates and fringe benefits. ManTech's proposed labor charges for named key personnel subject to TESA (Technical Expert Status Accreditation) were based on actual rates, while proposed labor rates for unnamed key TESA personnel and other TESA categories were based on [ ].[ ], in its cost proposal, Lockheed Martin stated that it had—

[ ].

Lockheed Martin acknowledged that [ ].

At the Army's request, the Defense Contract Audit Agency (DCAA) reviewed both offerors' cost proposals, after which, both

ManTech and Lockheed Martin were determined to be in the competitive range. Subsequently, the Army held discussions with the offerors regarding their initial proposals. Describing the scope of these discussions, an Army memorandum disclosed that, "[b]ased upon the importance of ensuring that the labor rates proposed were competitive, both offerors were asked to verify their rates and validate them with letters of intent from employees." Following these discussions, on June 5, 2000, both parties submitted revised proposals to the Army. After reviewing these submissions, the Army decided to conduct another round of discussions with each of the parties, focusing on one area in each of their respective technical proposals that had received a preliminary rating of "poor." After further review of the offerors' technical proposals, the Army's technical evaluation committee "unanimously agreed that the ManTech/Raytheon proposal was technically superior to the proposal of Lockheed Martin." Along these lines, ManTech's overall proposal rating was deemed "excellent;" while Lockheed Martin's overall rating was deemed only "good" (a rating depressed, in part, by a "poor" rating under Factor A of the technical approach).

ManTech's best and final offer price of [ ] was approximately [ ] more than Lockheed Martin's price of $68.5 million.[4] The Army, struck by this difference and the fact that Lockheed Martin's price was significantly lower than its own estimate, conducted a cost realism analysis of Lockheed Martin's SEPA costs and geographical allowances. In its proposal, Lockheed Martin stated that it expected [ ]. Based upon a conversation with a Lockheed Martin representative, the Army concluded that Lockheed Martin's total evaluated price should be increased by $10 million, to $78.5 million, to account for [ ]. This new figure also took into account [ ]. Further analysis of Lockheed Martin's labor categories, resulted in [ ], bringing the grand total to [ ].[5] The Army attributed the wide dispari-

4. ManTech also proposed an alternate price of [ ], based on adjusting the hours and categories of labor in their technical approach. But, it never submitted this proposal in the Labor Chart A format the Army requested.

5. ManTech alleges that, under the cost realism analysis, Lockheed Martin's original price should have been increased by [ ], to approximately [ ]. Such an adjustment would have reduced the

ty between this adjusted price and the [ ] price in ManTech's proposal not to any failure by Lockheed Martin to comply with the Solicitation, but rather to ManTech's [ ].

The Army established a joint committee, composed of a representative from each of the Technical, Management, and Past Performance Committees, to prepare a cost/technical tradeoff analysis. Although the Army found ManTech's technical proposal superior to that of Lockheed Martin, it concluded that the advantage was not so overwhelming as to warrant the premium that ManTech sought. In this regard, the committee concluded that "the risk of successful performance is low to moderate for both offerors. The advantages related to Mantech's technical proposal could not be equated to the cost premiums ...." Based on these findings, on June 29, 2000, the Army awarded the GENESIS contract to Lockheed Martin. The next day, June 30, 2000, ManTech requested a debriefing, which was held on July 7, 2000, at which time the Army disclosed to ManTech, Lockheed Martin's price, as adjusted under the cost realism analysis (*i.e.*, the $78.5 million figure),[6] and both offeror's adjectival ratings.

On July 11, 2000, ManTech filed a protest with the General Accounting Office (GAO) challenging the award to Lockheed Martin. ManTech alleged, *inter alia,* that: (i) the Army relaxed the Solicitation requirements by allowing Lockheed Martin to utilize a different labor cost scheme, which had the effect of understating the bid price used for evaluating the award; (ii) the Army failed to assess reasonably Lockheed Martin's proposed labor rates; (iii) the Army failed to verify properly Lockheed Martin's proposed overhead rates; (iv) the Army failed to adjust accurately Lockheed Martin's final offer for cost realism; and (v) the Army's Cost/Technical tradeoff lacked a rational basis. While, in response to the protest, the Army initially suspended performance of the GENESIS contract, on August 4, 2000, it lifted the suspension, citing the urgent and compelling needs of the Government.

On September 15, 2000, after two rounds of comments, the GAO held an outcome prediction conference with ManTech and Lockheed Martin. The GAO advised the parties that: (i) the protest was a relatively clear sustain; (ii) Lockheed Martin's cost proposal was not in accordance with the labor cost pricing requirements of the Solicitation; (iii) the Army erred in accepting Lockheed Martin's proposal; (iv) the Army's cost realism analysis of Lockheed Martin's proposal was flawed; (v) the Army's cost/technical tradeoff and best value decision was flawed; and (vi) ManTech was prejudiced by the Army's procurement errors. The GAO also recommended that the Army take corrective action, including reopening discussions with both offerors, permitting each of them to submit revised final proposals, and making a new source selection decision.

In response to these preliminary findings, on September 20, 2000, the Army proposed a somewhat different plan for corrective action. The Army advised the GAO that it was prepared to take the following actions:

a. Amend the solicitation to clarify pricing data required in Labor Charts A & B, required labor categories, and estimated hours. The amendment may also include associated conforming changes in other sections of the solicitation, as appropriate.

b. Reopen discussions with both offerors to identify areas of concern with fully loaded labor rates in Labor Charts A & B and any evaluation areas in which the offeror received a rating of "poor" or lower.

c. Permit both offerors to submit new final cost proposals and revised technical, management or past performance data for any evaluation factor or factors for which the offeror previously received a "poor" or lower evaluation.

d. Conduct a new evaluation of final proposals and make a new source selection decision. INSCOM will reconstitute the original evaluation panels except for those members who are

---

difference between the two offers from more than [ ] to less than [ ].

**6.** The record reflects that the price revealed to ManTech apparently [ ].

no longer employed in this command. Additionally, a new Source Selection Authority will make the award decision since the previous Source Selection Authority has retired from active military service.

The Army also indicated that it intended to release ManTech's proposed price for the GENESIS work and its proposal ratings to Lockheed Martin. Finally, the Army agreed to reimburse ManTech for the legal costs arising from its protest. On September 22, 2000, the Army submitted a second letter to the GAO, stating that it also intended to discuss with both offerors "some areas of concern regarding key personnel resumes and qualifications . . . ."

ManTech objected to the Army's proposed plan for corrective action, complaining that the plan placed ManTech at a competitive disadvantage by allowing Lockheed Martin the opportunity to recruit its personnel and to correct the flaws in its proposal. On September 22, 2000, GAO dismissed the protest, finding that the corrective action proposed by the Army essentially represented what the agency would have granted had it resolved the protest.

On September 27, 2000, ManTech filed a post-award bid protest complaint in this court, seeking therewith temporary, preliminary and permanent injunction relief against the United States. The motions for injunctive relief sought, *inter alia*, to suspend Lockheed Martin's performance of the GENESIS contract and to prevent the Army from instituting the corrective action. On September 29, 2000, this court conducted a hearing on the Motion for a Temporary Restraining Order, at the conclusion of which, it granted, in part, the motion, restraining the Army from instituting the corrective action proposed to the GAO, but refusing to suspend Lockheed Martin's continued performance of the GENESIS contract.[7] Subsequently, the defendant agreed to delay implementing the

corrective action plan until the court resolved this case and, based upon this agreement, ManTech withdrew its pending motion for a preliminary injunction. On November 13, 2000, ManTech filed a motion for summary judgment on the administrative record, to which defendant responded via cross motion on November 28, 2000 (with Lockheed Martin filing in support of this cross motion). The court heard oral argument on December 15, 2000.

## II. DISCUSSION

### A. Legal Background

■ In a bid protest case, this court will enjoin the government only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1994). *See also* 28 U.S.C. § 1491(b)(4) (1994 & Supp. V 2000). Regarding this standard, which is drawn from the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706 (1994), the Supreme Court has stated:

> Section 706(2)(A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted). *See also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed.Cir. 2000); *Blount, Inc. v. United States*, 22 Cl.

---

7. In its order, this court stated: "The court will not, at this time, restrain the continued performance of the GENESIS contract by Lockheed Martin. Based upon the record as it currently stands, the court believes that the potential harm to the United States and Lockheed Martin from suspending performance outweighs the potential

harm to ManTech of allowing the GENESIS contract to proceed. In particular, based upon the current record, the court determines that suspending Lockheed Martin's performance could pose a threat to national security. 28 U.S.C. § 1491(b)(3)."

Ct. 221, 227 (1990).[8] Accordingly, this court will interfere with the government procurement process "only in extremely limited circumstances." *CACI, Inc.Federal v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1372 (Fed.Cir.1983)). Indeed, a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement[9] under 48 C.F.R. § 15.605(c) (2000).[10] *See Mangi Envtl. Group v. United States,* 47 Fed.Cl. 10, 15 (2000); *TRW, Inc. v. Unisys Corp.,* 98 F.3d 1325, 1327–28 (Fed.Cir.1996); *LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1555 (Fed. Cir.1995) (citing *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 598 (1980)).

■ It is the burden of the aggrieved bidder to demonstrate that the challenged agency decision is either irrational or involved a clear prejudicial violation of applicable statutes and regulations. *See Seattle Security Servs., Inc. v. United States,* 45 Fed. Cl. 560, 566 (2000); *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 42 (1997); *Aero Corp. v. United States,* 38 Fed. Cl. 739, 749 (1997). Further, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). Finally, because injunctive relief is so drastic in nature, the plaintiff must demonstrate that its right to such relief is clear. *See Seattle Security Servs., Inc.,* 45 Fed.Cl. at 566. *Cf. Beta Analytics Int'l, Inc. v. United States,* 44 Fed.Cl. 131, 137 (1999). *See generally Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (emphasizing that injunctive relief is not routinely granted); Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 11A Federal Practice and Procedure § 2942 (1995) ("Since an injunction is regarded as an extraordinary remedy, it is not granted routinely; indeed, the court usually will refuse to exercise its equity jurisdiction unless the right to relief is clear.").

Motions for judgment on the administrative record are reviewed under the same standards as motions for summary judgment. *See* RCFC 56.1(a); *Hoskins v. United States,* 40 Fed.Cl. 259, 270 (1998). "Summary judgment is an integral part of the federal rules; it is designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Hunt v. Cromartie,* 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A motion for summary judgment on the administrative record is often an appropriate vehicle to scrutinize an agency's pro-

---

**8.** By its very definition, this standard recognizes the possibility that there exists a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). The Supreme Court burnished these twin requirements in *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), identifying four grounds upon which a holding of arbitrary and capricious agency action could be based. The Court stated:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of

the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43, 103 S.Ct. 2856. *See also OMV Med., Inc. v. United States,* 219 F.3d 1337, 1342 (Fed. Cir.2000).

**9.** The Federal Acquisition Regulation (FAR) defines "best value" as "the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement." 48 C.F.R. § 2.101 (2000).

**10.** All references herein to the Code of Federal Regulations are to the 2000 version, unless otherwise noted.

curement actions because the issues in such cases typically involve contractual and regulatory interpretation, thereby presenting no genuine issues of material fact. *See Dynacs Eng'g Co., Inc. v. United States*, 48 Fed.Cl. 124, 129–30 (2000); *Analytical & Research Tech., Inc.*, 39 Fed.Cl. at 43.

## B. Is the Proposed Corrective Action Here Arbitrary, Capricious or Otherwise Contrary to Law?

Following the award of the GENESIS contract to Lockheed Martin, plaintiff filed a protest with the GAO, challenging the award. Subsequently, the GAO indicated that it would likely sustain this protest. Responding to these developments, the Army proposed corrective action with four main prongs:

- amend the solicitation to clarify a potential ambiguity therein relating to the description of how offerors should present their hourly rates;

- reopen discussion with both offerors in areas of concern to the Army, including technical areas where an offeror received a good evaluation and regarding the qualifications of proposed key personnel;

- release some of plaintiff's pricing and ratings information to Lockheed Martin, attempting to provide Lockheed Martin with information similar to that provided to plaintiff during the debriefing; and

- following these actions, allow the two offerors to submit new cost proposals and revised technical, management and past performance proposals, ultimately leading to a new source selection decision.

Based on this proposal, the GAO dismissed the protest, finding that the proposed action was effectively what that agency would have recommended. Essentially complaining that the Army's proposed cure is worse than the disease, plaintiff argues that "[r]ather than fairly addressing the prejudicial improprieties committed by the Army during the procurement, the Army's proposed corrective action is designed to give Lockheed Martin every opportunity to render its proposal legitimately eligible for the GENESIS contract award." Defendant and intervenor vigorously contest this assertion, responding that the proposed action is well within the regulatorily-defined parameters of the Army's discretion and, as such, is neither arbitrary, capricious nor otherwise contrary to law.

Regarding the use of corrective action, this court has held that " '[c]ontracting officials in negotiated procurements have broad discretion to take corrective action where the agency determines that such action is necessary to ensure fair and impartial competition.' " *DGS Contract Serv., Inc. v. United States*, 43 Fed.Cl. 227, 238 (1999) (quoting *Rockville Mailing Serv., Inc.*, B–270161.2, 96–1 CPD ¶ 184, at 4, 1996 WL 166465 (Comp.Gen.1996)).[11] In this regard, this court and the Comptroller General have indicated that they will not object to an agency's proposed corrective action provided it is "reasonable under the circumstances," *DGS Contract Serv., Inc.*, 43 Fed.Cl. at 238, and "appropriate to remedy the impropriety," *Rockville Mailing Serv., Inc.*, 96–1 CPD ¶ 184, at 3.[12] In order to make these assessments, the court, *per force*, must review the improprieties—whether alleged or actual—that gave rise to the proposed corrective action under review.[13] It is to that subject to which the court now turns.

---

**11.** *See also Patriot Contract Servs., LLC, et al.*, B–278276.11, 98–2 CPD ¶ 77, at 4, 1998 WL 650259 (Comp.Gen.1998); *Oshkosh Truck Corp.; Idaho Norland Corp.*, B–237058.2, B–237058.3, 90–1 CPD ¶ 274, at 4, 1990 WL 277657 (Comp.Gen.1990).

**12.** *See also SMS Data Products Group, Inc.*, B–280970, B–280970.4, 99–1 CPD ¶ 26, at 3 (Comp.Gen.1999); *Southern Technologies, Inc.*, B–278030, B–278030.2, 97–2 CPD ¶ 167, at 4, 1997 WL 780015 (Comp.Gen.1997); *Aquidneck Sys. Int'l, Inc.*, B–257170.2, 94–2 CPD ¶ 122, at 4–5, 1994 WL 559524 (Comp.Gen.1994); *Henkels &*

*McCoy, Inc.*, B–250875, et al., 93–1 CPD ¶ 174, at 3, 1993 WL 57610 (Comp.Gen.1993); *Oshkosh Truck Corp.; Idaho Norland Corp., supra.*

**13.** Defendant argues that the Army's willingness to undertake corrective action moots the issue whether prejudicial errors were committed in the original source selection process. It relies on *CCL Service Corp. v. United States*, 43 Fed.Cl. 680, 689 (1999), in support of this proposition. In *CCL*, the government, after the initiation of suit, cancelled the solicitation. Noting that none of the protestors had challenged this action, this court held that the cancellation mooted the bid

### 1. Alleged Improprieties in the Consideration of Lockheed Martin's Proposal

At the outset, ManTech alleges that the Army committed several fundamental errors in considering Lockheed Martin's proposal, thereby prejudicing ManTech's ability to compete for the GENESIS contract. The court will bifurcate plaintiff's allegations, first focusing on alleged errors regarding the Army's review of Lockheed Martin's technical proposal and then shifting to allegations concerning the Army's consideration of Lockheed Martin's cost proposal.

#### a. Technical Proposal

The Solicitation established educational and experience requirements for eighteen individuals termed "Key Personnel," stating that these were the "minimum acceptable personnel qualifications" for each position. The Solicitation indicated that resumes which did not "clearly illustrate that the total experience and educational requirements have been met will not be accepted." Regarding these resumes, the Solicitation further provided:

> All resumes submitted in response to this RFP shall be in the following prescribed format. Any resume submitted that does not contain the required information in the format specified will be rejected. Offerors with rejected resumes will be considered

as not fulfilling RFP requirements for the position(s) in question.

ManTech argues that the personnel requirements for these eighteen key positions constituted so-called "mandatory minimum requirements" and that Lockheed Martin's failure to meet these requirements for two key positions should have led the Army to reject not only the resumes submitted for these positions, but, in turn, Lockheed Martin's entire technical proposal.[14] Because the Army did not do this, plaintiff claims, it failed to evaluate the proposals based solely on the criteria specified in the Solicitation, as required by 10 U.S.C. § 2305(b)(1) (1994) and 48 C.F.R. §§ 15.303(b), 15.305(a), 15.308. *See Mangi Envtl. Group, Inc. v. United States*, 47 Fed.Cl. at 18 (construing the cited provisions); *Beta Analytics Int'l, Inc. v. United States*, 44 Fed.Cl. at 138 (same).

By contrast, defendant and intervenor assert that Lockheed Martin's proposal should not have been rejected because the Solicitation did not require offerors to provide fully qualifying resumes for each of the key positions, but instead reflected that offerors would receive an adjectival rating based on the quality of the resumes provided. *Prima facie* evidence of this, they argue, may be found in the Source Selection Plan, which provided an adjectival scale for evaluating qualifying resumes. To be sure, that plan

---

protest action because no award could be made to any of the plaintiffs under the cancelled solicitation, thereby preventing the court from providing effective relief. *See id.* at 690. Remarking that the case had evolved in a "peculiar manner," the court, however, observed that the protestors, had they so desired, could have challenged the cancellation and went on to catalogue other types of corrective action that had been reviewed by this court. *Id.* Thus, *CCL* does not establish, as ManTech claims, the principle that alleged improprieties in a prior selection process are always irrelevant in analyzing proposed corrective action. *See also CW Gov't Travel, Inc. v. United States*, 46 Fed.Cl. 554, 559 (2000). Nor is there any doubt that this court has jurisdiction to review such corrective action. *See* 28 U.S.C. § 1491(b)(1) (conferring jurisdiction to render judgment on "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement").

14. The Solicitation stated that for the position of Principal Engineer, Electronics, the candidate must have a Masters of Science in Electrical Engineering from an accredited college or university, as well as various experience and knowledge pertaining to this position. In its initial technical proposal, the individual proposed by Lockheed Martin for this position was listed as likely completing his Masters in Engineering Management in May, 2000. The Technical Evaluation Committee concluded that this candidate's education did not fully match the educational requirements in the Solicitation and that "there is no trade-off between education and experience for this position." For the position of Senior Engineer Facility Planner, the Solicitation required military management experience. Lockheed Martin's initial candidate for this position, according to the Army Technical Evaluation Committee, "has neither the minimum education required by the solicitation nor the experience requirements." In its final technical proposal, Lockheed Martin proposed a different candidate for this position. The Technical Evaluation Committee found this candidate had the required education, but not the military facility experience required for this position.

states that an offeror would receive a rating of "Excellent" if, "[a]ll of the Offeror's key personnel exceed the minimum education and years of experience requirements;" "Good" if "[t]he majority of the Offeror's key personnel meet the minimum education and years of experience requirements;" "Poor" if "[s]ome of the offeror's key personnel meet minimum education and years of experience requirements;" and "Unacceptable" if "[t]he vast majority of an Offeror's key personnel do not meet the minimum education or years of experience." This document, thus, clearly envisions that the failure to provide a qualifying resume would effect the adjectival rating received in the evaluation, but not preclude a technical proposal from being evaluated at all. Plaintiff, however, correctly notes that the plan was neither included in the Solicitation, incorporated by reference, nor made known to the offerors until after final bids were submitted. Moreover, the GAO has repeatedly held that such plans generally do not give outside parties any rights and, thus, provide no basis for departing from the requirements of a solicitation.[15] As such, it appears the Source Selection Plan has little, if any, bearing in defining the rights of the parties under the Solicitation.

Rather, this court is obliged to look to the Solicitation in determining whether the minimum personnel requirements, combined with the clause requiring that complying resumes be submitted for each of the key positions, comprised a mandatory minimum requirement. So-called "mandatory minimum requirements" are essentially pass/fail in nature and may lead to the outright rejection of a proposal that falls short of what they speci-

fy. In determining whether such a requirement is present, this court must interpret the solicitation as a whole, wherever possible giving effect to the plain meaning of each word, clause or sentence. *See Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1483 (Fed. Cir.1998); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991); *Anderson Columbia Envtl. v. United States*, 43 Fed.Cl. 693, 698 (1999). A mandatory minimum requirement must be clearly identified as such within the solicitation so as to "put offerors on notice" of the serious consequences of failing to meet the requirement. *Isratex, Inc. v. United States*, 25 Cl.Ct. 223, 229 (1992). *See also Cubic Def. Sys., Inc. v. United States*, 45 Fed.Cl. 450, 460 (1999). As discussed by this court in *Isratex, Inc.*, 25 Cl.Ct. at 229–30, language used to provide such notice typically emphasizes that a proposal must meet the requirement in order to be eligible for evaluation or, conversely, that failure to comply with the requirement will lead to outright rejection of the proposal.[16]

Here, the provisions in the Solicitation cited by the plaintiff notify offerors that there were minimum personnel qualifications, that resumes not illustrating those qualifications would be rejected, and that offerors with rejected resumes would be viewed as not meeting Solicitation requirements. What these provisions do not readily reveal is their interrelationship, as well as the ramifications, ultimately, of not meeting a Solicitation requirement. Looking elsewhere in the Solicitation, it is notable that there is not so much as a hint intimating that the failure to provide a conforming resume would lead to the immediate exclusion of an entire proposal. In

---

15. *See Wilson 5 Serv. Co.*, B–285343.2, B–285343.3, 2000 CPD ¶157, at 4, 2000 WL 1535993 (Comp.Gen.2000); *DTH Mgmt. JV*, B283239, 99–2 CPD ¶68, at 4, 1999 WL 828064 (Comp.Gen.1999); *Mandex, Inc.; Tero Tek Int'l, Inc.*, B–241759 et al., 91–1 CPD ¶244, at 7, 1991 WL 73112 (Comp.Gen.1991). *See also Structural Pres. Sys., Inc.*, B–285085, 2000 CPD ¶131, at 6, 2000 WL 1154309 (Comp.Gen.2000) ("It is the evaluation scheme in the RFP, not internal agency documents, such as a source selection plan, to which an agency is required to adhere in evaluating proposals and making the source selection.").

16. *See, e.g., International Bus. Machs. Corp.*, GSBCA No. 9293–P, 88–1 B.C.A. (CCH) ¶20,512,

at 103,697, 1988 WL 44208 ("Proposals ... shall meet all the [G]overnment's requirements in Section C in order to be eligible for evaluation."); *Spectragraphics Corp.*, GSBCA No. 9194–P, 88–1 B.C.A. (CCH) ¶20,333, at 102,786, 1987 WL 46036 (where the RFP stated, "[t]he Government shall not consider for award proposals that do not meet the mandatory requirements"); *CPT Corp.*, GSBCA No. 8134–P–R, 86–1 B.C.A. (CCH) ¶18,727, at 94,206, 1986 WL 19610 (RFP stating, "[i]n order to have an acceptable proposal, the offeror must meet all of the mandatory requirements set forth in Section C.2 of the Solicitation Document").

fact, one provision, found in the segment entitled "Evaluation of Proposals," suggests that some deviations from the specified personnel qualifications would be tolerated without causing the elimination of an entire proposal. It states:

> Proposals will be reviewed, evaluated and given a consensus rating by the Source Selection Evaluation Board (SSEB) who will use an adjectival rating system to assist in rating the proposals received. As a complement to the overall scoring system, significant deficiencies which rate exceptionally low scores on specific elements/factors may be used as a basis for recommending that a proposal be eliminated from further consideration.

Two features of this provision are noteworthy and warrant a few words of emphasis and explanation.

The first sentence of this provision, in indicating that proposals will be rated on an adjectival basis, gives no indication that such rating will be preceded by various "go/no go" decisions. In this regard, this clause significantly differs from clauses establishing mandatory minimum experience requirements in other solicitations, which state explicitly that a proposal's compliance with the specified experience requirements will first be rated on "go/no go" basis and then, if and only if meeting such requirements, be subjected to an adjectival evaluation.[17] Plaintiff offers not the slightest explanation why, if the Army intended to incorporate a similar "go/no re-

quirement" into the Solicitation, it did not employ similar language. Further, the second sentence quoted above, describing the process for eliminating a proposal, conspicuously exhibits several sequential layers of discretion—a deficiency first has to be deemed "significant," then it must receive an "exceptionally low score;" which still does not automatically lead to elimination, but only to a "recommendation" that a proposal be eliminated. Ultimately, all of these discretionary steps presumably precede yet another discretionary act—the actual decision to eliminate the proposal. The compounded use of such discretionary language again starkly contrasts with the compulsory language typically used in setting forth a mandatory minimum requirement, as described above.

Taken together, the use of such discretionary language, combined with the absence of anything approximating the "go/no go" language often applied to experience requirements in other solicitations, lead this court to conclude that the Solicitation's minimum education and experience cannot reasonably be read as imposing a minimum mandatory requirement. Far from providing the requisite notice that failure to comply with the minimum experience and resume requirements would result in disqualification, the Solicitation, as a whole, signals that relatively minor deficiencies, rating something better than an exceptionally low score on a specific element or factor, would not result in a proposal being eliminated.[18] The court thus concludes

---

17. See, e.g., George Hyman Constr. Co., B-265798, B-265798.2, 95–2 CPD ¶ 173, at 3–5, 1995 WL 604642 (Comp.Gen.1995) (referring to "minimum acceptable past experience" as a "go/no go" requirement; proposals meetings this requirement would then be rated); Amtec Corp., B261487, 95–2 CPD ¶ 164, at 4, 1995 WL 578228 (Comp.Gen.1995) (same); George A. Fuller Co., B247171.2, 92–1 CPD ¶ 433, at 2, 1992 WL 108946 (Comp.Gen.1992) (same); Contract Servs. Co., B246585.3, 92–1 CPD ¶ 427, at 4, 1992 WL 108952 (Comp.Gen.1992) (same). Compare Mangi Envtl. Group, Inc. v. United States, 47 Fed.Cl. at 16 (holding identification of personnel requirement mandatory, but not the provision of resumes for such individuals, where solicitation indicated that proposals failing to provide, at a minimum, the names and proposed duties of the specified individuals "will be considered unacceptable and will not be considered further").

18. Indeed, elsewhere in the evaluation segment of the Solicitation, the Army made clear that certain prescribed conduct would lead to the rejection of a proposal. Thus, in the evaluation segment, it stated that "[p]roposals which merely offer to perform work in accordance with the RFP, or which fail to present more than a statement indicating its capability of compliance with the technical and management requirements without elaboration will be deemed to be unacceptable and will not be further considered." This language provides the dire warning that is absent in the language plaintiff claims rendered the minimum personnel requirements a mandatory minimum requirement. As this court noted in Isratex, Inc., 25 Cl.Ct. at 229–30, the presence of such mandatory minimum language in one section of a solicitation and its omission in another must be presumed to have been purposeful and provides a strong indication that the latter provision is not a mandatory minimum requirement. See also Computer Data Sys. v. Dept. of

that the Army's interpretation of the Solicitation appropriately did not require Lockheed Martin's exclusion from the competition.

In this regard, this case is similar to *Morse–Diesel Int'l, Inc.,* B–274499.2 et al. (December 16, 1996). There, the protestors argued that the agency improperly relaxed a solicitation requirement that the proposed project engineer have at least fifteen years of experience. They asserted that the project engineer in the winning bidder's proposal who had only 13 years experience did not meet this requirement, and, thus, the entire proposal should have been rejected. While the solicitation required offerors to meet certain experience thresholds for their key personnel, it also stated that:

> Proposals must meet the minimum standards established in the solicitation in order to be considered acceptable. Those proposals that don't meet a minimum standard are considered deficient, or unacceptable, for that evaluation factor or subfactor. Individual deficiencies do not necessarily render the whole proposal unacceptable to the Government. A proposal is considered unacceptable to the Government, as a whole, when it is deficient to the extent that, to allow an offeror to correct those deficiencies would constitute a complete rewrite of the proposal. The determination as to whether a proposal is deficient to that extent is made at the discretion of the Evaluation Board. In making such a determination, the Board will consider such things as the number and severity of the deficiencies.

*Id.* at 7. Based on this evaluation clause, the GAO reasoned that "[w]hile minimum experience requirements ordinarily must be met in order for a proposal to be considered technically acceptable (and thus eligible for award), the above-quoted language clearly signaled to the offerors that GSA would treat a firm's failure to meet a minimum requirement as an evaluation consideration rather than as a 'go/no go' criterion for evaluation and award purposes." *Id.* The GAO thus concluded that, under the quoted provision, "the agency

was not required to reject a proposal as unacceptable for an unmet personnel experience requirement," but instead "was to consider in its evaluation whether a particular deficiency was so material that it rendered the offer unacceptable." *Id.* Like the solicitation in *Morse–Diesel,* the minimum experience requirements here must be read in light of other provisions in the Solicitation, which indicate that those experience requirements are not minimum mandatory requirements.

In arguing to the contrary, plaintiff relies heavily on *Analytical & Research Tech., Inc. (A & RT) v. United States,* 39 Fed.Cl. at 45. There, a disappointed bidder on an Army contract to provide computer and data processing support brought a post-award bid protest, claiming that the Army had improperly evaluated its technical proposal in assigning a "zero" score to seventeen individuals who did not meet the minimum experience requirements for the positions that were identified. The contractor asserted that the Army should, *inter alia,* amend the solicitation to make clear that the minimum experience requirements were, in effect, minimum mandatory or "go/no go" requirements. This court began its analysis with the observation that "[g]enerally, a minimum experience requirement is, by its very nature, a go/no-go requirement, the failure of which to meet renders that portion of the offeror's bid technically unacceptable." *Id.* at 44. In finding this rule applicable, this court emphasized that the solicitation and the source selection plan—

> defined what was the minimum years of experience required for proposed personnel, stated that proposed personnel would receive a score of "unacceptable" if they did not meet the minimum experience requirements, and, further, defined 'unacceptable' as a numerical score of zero.

*Id.* at 45–46 ("[T]he solicitation stated that proposed individuals, who did not meet the minimum experience requirements, would be unacceptable and, thus, receive a technical score of zero."). The court thus deferred to

*Energy,* G.S.B.C.A. 12824–P, 1995 WL 126396 (G.S.B.C.A. Mar.23, 1995) (employing same mode of analysis in concluding that corporate

experience requirement was not a mandatory minimum requirement).

the Army's interpretation of the solicitation, rejecting the contractor's protest, in holding that "[a]lthough the solicitation explicitly did not mention the term 'go/no-go,' it was clear in the solicitation that individuals, who failed to meet the minimum experience requirements, would not be considered further." *Id.* at 45.

Perhaps because it also involved experience requirements in an INSCOM computer contract, *A & RT*, at first glance, adds plausibility to plaintiff's position—this initial impression, however, does not withstand closer scrutiny for several reasons. First, in *A & RT*, the Army did not exclude an entire proposal, as plaintiff seeks, but instead merely assigned a zero score to portions of a proposal. Indeed, in announcing the "general rule" concerning a failure to meet a solicitation's experience requirements, this court, in *A & RT*, indicated only that such a failure renders "that portion" of the offeror's bid unacceptable.[19] Second, and relatedly, in *A & RT*, this court did little more than enforce the terms of the solicitation and the source selection plan, which apparently plainly warned that nonconforming employees would receive scores of zero. As discussed above, a similar warning was neither provided in the Solicitation nor, to the extent relevant, in the Source Selection Plan.[20] Third, in *A & RT*,

this court applied the deferential arbitrary and capricious standard in *upholding* the Army's construction of the solicitation as imposing a minimum experience requirements. Here, plaintiff would have this court *overturn* the Army's construction under that same deferential standard of review. Given the factual differences between the cases, this is clearly a *non sequitur*.[21] Finally, the contractor in *A & RT* did not, as the plaintiff does here, seek the outright award of the contract, but instead sought, *inter alia*, an amendment of the solicitation—the precise relief that the Army has already volunteered to undertake here and that plaintiff so vociferously opposes.[22] Accordingly, for all these reasons, *A & RT* is clearly distinguishable.

Based on the foregoing, this court concludes that the Army did not act in an arbitrary or capricious fashion, or contrary to law, in considering Lockheed Martin's technical proposal.

### b. Cost Proposal

ManTech also alleges that Lockheed Martin's cost proposal did not comply with the Solicitation because it failed to include the proper types of costs in Labor Rate Chart A, so as to reflect a single, fully loaded, hourly rate for each of the sixty labor categories. The Solicitation advised that the Army would multiply the estimated labor

19. Of course, even this "general rule" does not apply if other language in the solicitation leads to the conclusion that the experience requirements were not intended to be mandatory minimum requirements. *See Morse–Diesel, supra; EER Sys. Corp.*, B256383, et al., 94–1 CPD ¶ 354, at 17, 1994 WL 250193 (Comp.Gen.1994) (experience requirement not a mandatory minimum requirement where other provisions in solicitation provided agency with discretion in determining whether offered individual could perform the job).

20. To the extent the court in *A & RT* relied on the source selection plan contained in the record, it bears noting that, by comparison, the Source Selection Plan here clearly envisions that deficiencies in resumes would result in reduced adjectival ratings and not the total exclusion of a proposal.

21. Courts have often described the arbitrary and capricious standard as demanding only that an agency's decision fall within "a range, not a point." *See, e.g., Collins v. American Cast Iron Pipe Co.*, 105 F.3d 1368, 1370 (11th Cir.1997)

(quoting *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1052–53 (7th Cir. 1987)). Such review, if applied properly, focuses more on the rationality of an agency's decision-making process, than on the conclusion derived therefrom, and, thereby, clearly envisions that slight variations in facts might rationally lead an agency to reach differing, yet judicially sustainable, conclusions. Accordingly, like a faulty syllogism, a decision holding that the action of an agency is *not* arbitrary and capricious is not readily transposed into a decision that a different action by the same agency *is* arbitrary and capricious.

22. Notably, the administrative record does not reveal that defendant ever discussed with Lockheed Martin that its failure to comply with the minimum experience requirements would render its entire proposal unacceptable. As such, the Army seemingly could not have disqualified the proposal for this reason without running afoul of the requirement that it conduct "meaningful discussions" with the Lockheed Martin. *See* 48 C.F.R. § 15.306(d)(3). This point is further addressed below.

hours by the labor rates proposed by the offerors, to arrive at a total evaluated price for each offeror. According to ManTech, the Army committed at least two significant errors in evaluating Lockheed Martin's cost proposal.

 First, ManTech again alleges that the Army erred in considering Lockheed Martin's proposal at all, rather than simply eliminating Lockheed Martin from the competition. For purposes of this assertion, the court assumes, *arguendo*, that Lockheed Martin's cost proposal did not conform to the Solicitation's requirements because it listed pay adjustments relating to an employee's [ ]. Nonetheless, ManTech's assertion that the Army, for this reason, was required to exclude Lockheed Martin from the competition is not well taken. To the contrary, where, in a negotiated procurement, an offeror's proposal does not comply with the solicitation's requirements, "an agency is not required to eliminate the awardee from the competition, but may permit it to correct its proposal." *D & M Gen. Contracting, Inc.*, B–252282, B–252282.4, 1993 WL 325094, at *2 (Comp.Gen. Aug.19, 1993). *See also SMS Data Products Group, Inc. v. Austin*, 940 F.2d 1514, 1517 (Fed.Cir.1991). The objective, in this circumstance, is to place all offerors in the same competitive position. *Henkels & McCoy, Inc.*, B–250875 et al., 93–1 CPD ¶ 174, at 4, 1993 WL 57610 (Comp.Gen.1993). To be sure, Lockheed Martin's failure to comply with Solicitation would preclude it from receiving an award as "[i]t is fundamental that a materially noncompliant proposal cannot form the basis of an award." *Spectrofuge Corp. of North Carolina, Inc.*, B–281030.3, 99–1 CPD ¶ 65, at 2, 1999 WL 202007 (Comp. Gen.1999). *See also Barents Group, L.L.C.*, B–276082, B–276082.2, 97–1 CPD ¶ 164, at 10, 1997 WL 282110 (Comp.Gen.1997); *Martin Marietta Corp.*, B–233742.4, 90–1 CPD ¶ 132, at 7, 1990 WL 269506 (Comp.Gen. 1990). But, contrary to ManTech's claim, such a defect does not warrant Lockheed Martin's total exclusion from the bidding, but

instead may be remedied by steps designed to assist Lockheed Martin in bringing its cost proposal into conformity with the Army's requirements.

 In this regard, it is helpful to consider the Army's conduct not just from ManTech's perspective, but also from Lockheed Martin's vantage. Under the FAR, if Lockheed Martin's cost proposal did not conform to the Army's interpretation of the Solicitation, the Army was required to conduct further discussions with Lockheed Martin to allow it to correct its proposal. Agencies are generally required to conduct discussions with all responsible offerors who submit proposals within the competitive range. 48 C.F.R. § 15.306(d). Such discussions "are intended to maximize the government's ability to obtain the 'best value' in a contract award based on the requirements and the evaluation factors set forth in the solicitation." *Dynacs Eng'g Co.*, 48 Fed.Cl. at 130. *See also* 48 C.F.R. § 15.306(d)(2). In this regard, section 15.306(d)(3) of the FAR provides:

> The contracting officer shall ... indicate to, or discuss with, each offeror still being considered for an award, significant weaknesses, deficiencies, and other aspects of its proposal (such as cost, price, technical approach, past performance, and terms and conditions) that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award.

48 C.F.R. § 15.306(d)(3). Case law requires that discussions with offerors whose proposals are found to be in the competitive range be "meaningful" and has held that this requirement is not met if an offeror is not advised, in some way, of defects in its proposal that do not meet the requirements of the solicitation. *See Dynacs Eng'g Co.*, 48 Fed.Cl. at 131; *Biospherics, Inc. v. United States*, 48 Fed.Cl. 1, 9 (2000); *Advanced Data Concepts*, 43 Fed.Cl. at 422; *Huff & Huff Serv. Corp.*, B–235419, 89–2 CPD ¶ 55, at 3–4, 1989 WL 240941 (Comp.Gen.1989).[23]

---

**23.** This conclusion proceeds directly from the FAR, which defines the term "deficiency" as used in section 15.306(d), as "a material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." 48 C.F.R. § 15.301. As one pair of commentators

Where an award has been made to an offeror whose proposal proved unacceptable, the GAO has frequently sanctioned further discussions between the agency and the offeror if the offer was reasonably susceptible of being cured. Thus, for example, in *D & M Gen. Contracting, Inc., supra,* several offerors failed to meet requirements in the solicitation regarding their management submissions. In response, the agency proposed corrective action under which it would reopen discussions and advise the offerors to disregard the solicitation's requirements in submitting revised best and final offers. A contractor whose proposal had conformed with the solicitation protested, asserting that the agency, instead, was required to disqualify the offerors whose proposals were nonconforming. In rejecting this protest and upholding the proposed action, the GAO stated that "[w]here, as here, award was made to an offeror whose proposal did not comply with RFP requirements, an agency is not required to eliminate the awardee from the competition, but may permit it to correct its proposal." 1993 WL 325094 at *2. The GAO determined that the proposed corrective action "resolves any adverse effects and prejudice the waiver of the ... restriction may have produced, since, as the result of discussions, [the contractor] was provided the opportunity to compete equally" and "[a]ll offerors were placed in the same competitive position." *Id. See also Henkels & McCoy,* 93–1 CPD ¶ 174, at 4, 1993 WL 57610.

Based on the analysis in these cases—which the court believes sound—Lockheed Martin's failure to comply with the Solicitation did not oblige the Army to exclude its proposal, but, instead, provided a basis for further discussions and other steps designed to cure the identified defects. Given this, had the Army, without prior warning, elimi-

nated Lockheed Martin from the competition, as ManTech urges, its action would have been vulnerable to serious legal challenge.

ManTech, however, also asserts that the Army erred in performing a cost realism analysis of [ ] in Lockheed Martin's proposal, through which the Army essentially adjusted Lockheed Martin's price to make it more readily comparable to that of ManTech. In this regard, the Solicitation advised offerors that the cost proposals would not be numerically scored, but would be subject to a cost realism assessment. This assessment was to include verification of an offeror's indirect rates and a random sampling of the base rates proposed for individual labor categories in Labor Rate Chart A. ManTech contends, *inter alia,* that the Army failed to adjust properly Lockheed Martin's hourly rates [ ]. For its part, the Army asserts that because, in the face of ManTech's allegations and the GAO's reaction thereto, it has proposed to amend the Solicitation and seek new proposals, it is irrelevant whether the cost realism adjustments it made to Lockheed Martin's prior cost proposal were appropriate.

At this point, it is important to recall that the government is not obliged to admit an error as a precondition to proposing corrective action and, as such, the proposed corrective action does not amount to an admission that the cost realism analysis was done incorrectly.[24] While the court believes that ManTech has raised serious concerns regarding this analysis, several reasons—although not necessarily those offered by the Army—make it unnecessary for the court to address fully those concerns. First, while, as discussed above, this court must assess the nature of alleged errors in determining whether proposed corrective action is appro-

---

has noted, such deficiencies can include "failures to meet specifications, failures to submit information, or questionable technical or management approaches." John Cibinic, Jr. and Ralph C. Nash, Jr., Formation of Government Contracts 891 (3d ed.1998).

24. In *CCL,* 43 Fed.Cl. at 692, this court held that the government's proposed corrective action did not amount to an admission of impropriety. *See also SMS Data Prods. Group, Inc.,* 99–1 CPD ¶ 26, at 3, 1999 WL 40943 (Comp.Gen.1999) ("It

is not necessary for an agency to conclude that the protest is certain to be sustained before it may take corrective action; where the agency has reasonable concern that there were errors in the procurement, even if the protest could be denied, we view it as within the agency's discretion to take corrective action."); *Federal Sec. Sys., Inc.,* B–281745.2, 99–1 CPD ¶ 86, at 4–5, 1999 WL 292729 (Comp.Gen.1999); *Main Bldg. Maint., Inc.,* B–279191.3, 98–2 CPD ¶ 47, at 3, 1998 WL 517829 (Comp.Gen.1998) (same).

priate, that analysis need be no more detailed than is necessary to determine whether a particular prong of that action is or is not warranted. Second, this court concludes that, for other reasons discussed below, Lockheed Martin must be afforded an opportunity to submit a new cost proposal, thereby rendering ManTech's allegations of error regarding the Army's cost realism analysis largely irrelevant.

### 2. Is the Proposed Corrective Action Reasonable Under the Circumstances and Appropriate to Remedy the Alleged Improprieties that Occurred?

Having, through the foregoing tour d'horizon, established a base of reference for evaluating the proposed corrective action, the court now moves to consider each of the four main prongs of that proffered action *seriatim.*

### a. Amending the Solicitation

■ The first question immediately encountered is whether the decision to amend the solicitation to clarify the cost provisions is arbitrary, capricious or otherwise contrary to law. The government argues that amending the solicitation is mandated by section 15.206(d) of the FAR, which provides:

> If a proposal of interest to the Government involves a departure from the stated requirements, the contracting officer shall amend the solicitation, provided this can be done without revealing to the other offerors the alternate solution proposed or any other information that is entitled to protection.

48 C.F.R. § 15.206(d). Plaintiff argues that this provision is inapplicable because the government does not intend to modify the stated requirements, but · instead only to clarify them. In the court's view, however, it matters not, under the terms of this regulation, whether the proposed modifications to the cost proposal requirements of the Solicitation are properly viewed as a change in or relaxation of those requirements or, alternatively, as merely clarification thereof, for, in either

case, it is not unreasonable for the government to conclude that Lockheed Martin's proposal involved a "departure from the stated requirements." As such, section 15.206(d) of the FAR appears to authorize the proposed amendment of the Solicitation and nothing therein precludes such an amendment from taking the form of a clarification and reaffirmation of the prior Solicitation's requirements, as is apparently envisioned by the Army here.

■ Even were section 15.206(d) of the FAR inapplicable, the government would still be authorized to amend the Solicitation based upon an exercise of its discretion. Thus, as a general rule, in a negotiated procurement, the contracting agency has broad discretion to amend the solicitation when it determines that such action is necessary to ensure fair and impartial competition and to permit the government to obtain its minimum requirements at the most favorable price. On this point, it is important to note that while section 15.206(d) specifies situations in which an agency *must* amend a solicitation, by its terms, it neither defines the only situations in which such an amendment *may* be appropriate nor, conversely, precludes the agency from amending the solicitation in other circumstances. *See Bethlehem Steel Corp.,* B–231923, B–231923.2, 88–2 CPD ¶ 438, at 7, 1988 WL 228164 (Comp. Gen.1988) ("FAR § 15.606(a) [predecessor to section 15.206(d) ] does not purport to limit the reasons an agency may amend a solicitation; it only states when amendments are required."). Rather, the GAO has repeatedly held that "[a]n agency may amend a solicitation, and request and evaluate another rounds of BAFOs where the record shows that the agency made the decision to take this action in good faith, without the specific intent of changing a particular offeror's technical ranking or avoiding an award to a particular offeror." *Federal Sec. Sys., Inc.,* B–281745.2, 99–1 CPD ¶ 86, at 5, 1999 WL 292729 (Comp.Gen.1999). *See also Logicon, Inc. v. United States,* 22 Cl.Ct. 776, 784–89 (1991).[25]

---

25. *And see SMS Data Prods. Group, Inc.,* B–280970.4, 99–1 CPD ¶ 26, at 3, 1999 WL 40943 (Comp.Gen.1999); *Patriot Contract Servs., et al.,* B–278276.11, 98–2 CPD ¶ 77, at 4, 1998 WL 650259 (Comp.Gen.1998); *Burns & Roe Servs. Corp.,* B–248394, 92–2 CPD ¶ 124, at 5, 1992 WL

In the instant case, ManTech does not allege, nor is there any evidence that suggests, the Army here is acting in bad faith, actuated by *animus*, with a specific intent to harm ManTech.[26] Nor is there anything in the administrative record suggesting that the amendment clarifying the pricing requirements has been proposed with the specific intent of changing Lockheed Martin's ranking or avoiding an award to ManTech. ManTech, of course, speculates that if the tables were turned and Lockheed Martin in its position, the Army would not be affording ManTech the same second bite at the apple. Such speculation, however, will not support an assertion of bad faith. *See, e.g., CACI, Inc.—Federal v. United States,* 719 F.2d at 1581–82. Rather, the administrative record suggests that the corrective action was proposed simply to ensure that the award was made on a basis most advantageous to the government. Indeed, while not determinative, it bears noting that the GAO, certainly an unbiased arbiter, dismissed the protest in question based on its conclusion that "the agency's proposed corrective action is responsive to the protest allegations and is basically the relief our Office would have granted had we resolved the protest." In these circumstances, it is beyond peradventure that the Army's proposal to amend the Solicitation's price requirements is not arbitrary, capricious or contrary to law.

But what of the Army's attempt to adjust not only the cost requirements, but also the technical requirements in the Solicitation?

To be sure, one might plausibly argue that the latter action is unwarranted based on this court's finding that the Army committed no error in considering Lockheed Martin's technical proposal. But, the Army argues that, notwithstanding this, it should be allowed to address "any differential regarding labor requirements that has been identified since the issuance of the solicitation," asserting that such amendments are required by 48 C.F.R. § 15.206(a), which states that "[w]hen, either before or after receipt of proposals, the government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation." According to the GAO, "[t]he purpose of the rule is to avoid award decisions not based on the agency's most current view of its needs." *NV Servs.,* B–284119.2, 2000 CPD ¶ 64, at 12, 2000 WL 350269 (Comp.Gen.2000). *See also Dairy Maid Dairy, Inc.,* B–251758.3 et al., 93–1 CPD ¶ 404, at 6–7, 1993 WL 188678 (Comp. Gen.1993). While the administrative record is unclear as to the exact nature of the "changes" the Army wishes to make in its technical requirements, there is indication that shifting and shrinking personnel needs may make some alteration of the technical requirements in order.

ManTech is understandably concerned that if this court permits the Army to revise the technical requirements of the solicitation, Lockheed Martin will submit a revised proposal curing deficiencies in its original submission. ManTech asserts that it is unfair to allow Lockheed Martin to improve its technical standing if the only problems in the prior

215397 (Comp.Gen.1992); *PRC, Inc.,* B–233561.8, B–233561.9, 92–2 CPD ¶ 215, at 3–4, 1992 WL 278902 (Comp.Gen.1992). *And see Discount Machinery & Equipment, Inc.,* B–231068, 88–1 CPD ¶ 608, at 3, 1988 WL 227346 (Comp.Gen.1988) (agency may amend solicitation unless "showing of fraud or intentional misconduct by the government").

26. It is well settled that government officials are presumed to act conscientiously and in good faith in the discharge of their duties. *See, e.g., Spezzaferro v. Federal Aviation Admin.,* 807 F.2d 169, 173 (Fed.Cir.1986); *Asco–Falcon II Shipping Co. v. United States,* 32 Fed.Cl. 595, 604 (1994); *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976). In order to overcome this presumption, "plaintiff must allege and prove, by clear and strong evidence,

specific acts of bad faith on the part of the government." *Asco–Falcon,* 32 Fed.Cl. at 604 (citing *Continental Collection & Disposal, Inc. v. United States,* 29 Fed.Cl. 644, 652 (1993)). The level of proof to overcome this presumption is high, often described as requiring "well nigh irrefragable proof." *Kalvar,* 543 F.2d at 1301–02. While this standard is not intended to "insulate government action from any review by courts," *Libertatia Assoc., Inc. v. United States,* 46 Fed.Cl. 702, 707 (2000), according to the Federal Circuit, the "well nigh irrefragable proof" standard "has been equated with evidence of some specific intent to injure the plaintiff." *Kalvar,* 543 F.2d at 1302; *see also Librach v. United States,* 147 Ct.Cl. 605, 614, 1959 WL 7633 (1959) (finding no bad faith because officials involved were not "actuated by animus").

selection process involved the Solicitation's cost requirements—problems that ManTech, of course, believes were of Lockheed Martin's own making. *Per contra.* In the court's view, the concerns raised by ManTech are subsumed and fully addressed in the context of the standard the courts have employed in reviewing proposed amendments, *to wit,* is the action taken "in good faith, without the specific intent of changing a particular offeror's technical ranking or avoiding an award to a particular offeror." *Federal Sec. Sys., Inc., supra.* At the core of this standard are essentially the same types of fairness concerns that ManTech raises, in particular, the concern that an amendment not be used as a vehicle to steer a contract toward or away from a particular contractor. These fairness concerns are neither implicated nor offended to the extent such an amendment is designed, instead, merely to ensure that the United States receives the best possible value at the lowest cost—indeed, such is the essence of a best value procurement.[27]

▮ Stripped of its veneer, plaintiff's complaint essentially is that if the Army's proposed corrective action proceeds, it may lose the edge it had in the adjectival ratings assigned to the technical proposals. But, in a negotiated procurement, where an error has been alleged or detected, the government

is not precluded from amending the solicitation, or even cancelling and resoliciting, simply because the receipt of new proposals could cause the comparative adjectival ratings of two competitors to shift. Were that not the case, and the government was instead required to preserve inviolate all rating advantages enjoyed by a protestor in the initial selection process, it would be the rare situation, indeed, where the government could exercise the authority conferred by the FAR to amend a solicitation or conduct further discussions, because in most selection processes a protestor could point to some ratings advantage on either a factor or a subfactor that might be lost if new or revised proposals were filed.[28] In effect, then, plaintiff's theory would emasculate several key provisions of the FAR. Choosing, instead, to effectuate these same FAR provisions, this court must conclude that the requirement for a fair and equal competition must take priority over preserving every advantage initially enjoyed by a protester in a selection process that ultimately proves defective. In such circumstances, fair and equal competition is maintained by allowing all competitors to respond to the amended solicitation, an action that also preserves the government's ability to obtain the best possible value corresponding to its current needs.[29]

27. Plaintiff essentially would have this court second guess the Army's decision that its needs have changed enough to warrant modification of the Solicitation. This court, however, will not accept this invitation to leave reason at the doorstep in construing section 15.206(a) of the FAR. In this regard, it is once again important to note that, like section 15.206(d) of the FAR, section 15.206(a) defines when an agency *must* amend a solicitation and does not purport to define all the instances in which such an amendment may be reasonable or permitted. Plaintiff's attempt to have this court limit the Army's discretion in determining whether its needs have changed enough to warrant an amendment not only runs headlong into the narrow standard of review here, but seemingly would require this court to freeze the Army's needs as of some particular point in time, *i.e.,* the time of decision, and assess whether an amendment is then required or permissible. Such an approach is rigid and formalistic at best, given the possibility that a day, a week, or a month later, the Army's needs may have shifted or accumulated further, essentially rendering any prior decision on whether changes were necessary factually moot and requiring, in theory, constant reconsideration of the court's

prior ruling. The court sees no basis in the regulations for it to assume such an unwieldy and continuing oversight role, particularly in a case, such as this, involving national security concerns. The Federal Circuit has cautioned that "judicial deference must be 'at its apogee' in matters pertaining to the military and national defenses." *Voge v. United States,* 844 F.2d 776, 779 (Fed.Cir.1988), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988) (quoting *Rostker v. Goldberg,* 453 U.S. 57, 70, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981)).

28. The GAO has reached a similar conclusion in allowing an agency to modify a solicitation and reopen discussions in situations where one or more offerors failed to meet requirements in the original solicitation. In such cases, the GAO has concluded that any adverse effects experienced by a protestor were addressed by placing all offerors in the same competitive position. *See D & M Gen. Contracting, Inc., supra; Henkels & McCoy, supra.*

29. There are some reported cases in which agencies have decided to limit the amendment of a solicitation and the resulting proposals to

Here, the ability to submit new proposals, and the further discussions attendant to those proposals, provides Lockheed Martin with an opportunity to improve its technical proposal. But, it also affords ManTech an opportunity to improve not only its technical proposal, but also its cost proposal. Among other things, this situation offers ManTech a chance to flush out the [ ] offer ( [ ] less than its formal offer) that it made informally during the prior selection process. Moreover, as will be discussed in greater detail below, ManTech has the opportunity to amend its cost proposal knowing that the price it initially proposed was significantly higher than that of Lockheed Martin. In these circumstances, this court concludes that the Army's proposal to amend the solicitation here is not arbitrary, capricious or otherwise contrary to law.

### b. Conducting Further Discussions on the Technical Proposals

 If, as this court has concluded, it is appropriate for the Army to amend the Solicitation, then it follows, under the FAR, that the Army may conduct further discussions with the competitors regarding areas of concern, including issues involving the fully loaded labor costs and key personnel. As noted above, agencies generally are required to conduct "meaningful" discussions with all responsible offerors which submit proposals within the competitive range. See 48 C.F.R. § 15.306(d). Moreover, the FAR further emphasizes that "[t]he scope and extent of discussions are matters of contracting officer judgment." 48 C.F.R. § 15.306(d)(3). Nothing in the FAR suggests that these provi-

sions are any less applicable following an amendment to a solicitation.

Plaintiff, however, argues that further discussions regarding the technical proposals are unwarranted because the Army already supplied Lockheed Martin with an opportunity to correct any material weaknesses in its technical proposal. But, the current version of the FAR provides otherwise. Solicitations issued after January 1, 1998, such as the one here, are governed by the FAR, as amended by the Federal Acquisition Circular (FAC) No. 97–02. The FAR part 15 rewrite, included in this amended version of the regulation, revised substantially the provisions that apply to negotiated procurements, including those provisions governing exchanges with offerors after the receipt of proposals, as set forth in 48 C.F.R. § 15.306. The prior version of the FAR contained provisions that had been read to limit drastically the extent to which agencies could conduct ongoing discussions with an offeror. Thus, agencies were prohibited, for example, from engaging in technical leveling, i.e., helping an offeror to bring its proposal up to the level of other proposals through successive rounds of discussions by pointing out weaknesses resulting from the offeror's lack of diligence, competence, or inventiveness in preparing the proposal. See 48 C.F.R. § 15.610(d) (June 1997); Professional Servs. Group, Inc., B–274289.2, 97–1 CPD ¶ 54, at 5, 1996 WL 776943 (Comp.Gen.1996). Agencies were also cautioned against reopening discussions after receipt of best and final offers, unless it was manifest that the information already available was inadequate to reasonably justi-

only one or several requirements of the solicitation, e.g., responding only to the cost requirements or only to the technical requirements. The GAO has approved these limited amendments as against protests by entities seeking to submit entirely new proposals. See, e.g., ST Aerospace Engines Pte. Ltd., B–275725.3, 97–2 CPD ¶ 106, at 4–5, 1997 WL 639968 (Comp. Gen.1997) (amending and receiving proposals only with respect to technical requirements); Krueger Int'l Inc., B–260953.4, 96–1 CPD ¶ 235, at 3–5, 1995 WL 861604 (Comp.Gen.1996); Serv–Air, Inc., B–258243.4, 95–1 CPD ¶ 125, at 2–3, 1995 WL 90181 (Comp.Gen.1995) (amending and receiving proposals only with respect to the cost requirements); System Planning Corp., B–244697.4, 92–1 CPD ¶ 516, at 3–4, 1992 WL 142553 (receiving new proposals only

with respect to offerors' submissions of financial stability). In these cases, however, the GAO has emphasized that it was deferring to agency discretion and that the "general rule" was that, in response to an amendment and discussions, offerors may revise any aspect of their proposals they see fit, including portions that were not the subject of the amendment and discussions. See, e.g., Krueger, supra at 4. Moreover, in none of these cases did either the government or the GAO conclude that it was necessary to limit the scope of an amendment and subsequent discussions to preserve the edge a protestor previously enjoyed over other competitors in adjectival ratings on one or more factors or subfactors. Nor has the court been pointed to any decision of this or any other court holding or intimating such a result.

fy an award. 48 C.F.R. § 15.611(c) (June 1997). These restrictions, however, were eliminated by the part 15 rewrite, in favor of more general limits on exchanges. *See* 48 C.F.R. 15.306(e); *Synetics, Inc. v. United States,* 45 Fed.Cl. 1, 16–17 (1999).

The current FAR provisions do not discourage agencies from resolving a given proposal's weakness or deficiency by means of multiple rounds of discussions with the offerors, provided the discussions are not conducted in a fashion that favors one offeror over another. *See* 48 C.F.R. § 15.306. Indeed, both the objective of discussions—to maximize the government's ability to obtain the best value, based on the requirements and evaluation factors set forth in the solicitation, 48 C.F.R. § 15.306(d)(2)—as well as the FAR's definition of discussions—which includes bargaining, consisting of persuasion, alteration of assumptions and positions, and give and take, 48 C.F.R. § 15.306(d)—both presuppose that there may be multiple rounds of discussions regarding a single issue. Nothing in the regulation suggests that further discussions on an issue are impermissible simply because they may occur on separate occasions, over a period of time. In particular, the discussions proposed by the Army here have the potential of benefitting both offerors and, thus, do not constitute conduct that favors one offeror over another, but rather seek to "enhance materially the proposal[s'] potential for award" and, thereby, "maximize the Government's ability to obtain best value." 48 C.F.R. § 15.306(d)(2), (3).[30] Accordingly, this court concludes there is nothing improper in the Army's proposal to raise the same concerns in a new round of discussions with Lockheed Martin that it previously discussed with that contractor. *See Dynacs Eng'g Corp.,* B284234, B–284234.2, B–284234.3, 2000 CPD ¶ 50, at 4, 2000 WL 330078 (Comp.Gen.2000).

### c. Sharing ManTech's Proposal Information with Lockheed Martin

While it may follow, under the FAR, that if it is appropriate to amend the Solicitation, the Army must be permitted to conduct further discussions, the court's affirmation of these first two steps does not lead, *a fortiori,* to the third prong of the Army's proposed corrective action—that Lockheed Martin receive ManTech's price information and adjectival ratings. In this case, the Army disclosed to ManTech the total evaluated price of Lockheed Martin's proposal, including therein the $10 million adjustment made thereto in the name of cost realism. It also provided ManTech with the adjectival ratings Lockheed Martin received on its various proposals. The Army and intervenor argue that if Lockheed Martin does not receive comparable information, ManTech will retain an unwarranted competitive advantage in forming its new proposal.

■ Defendant argues that the exchange of information is required by 48 C.F.R. § 15.507. Paragraph (b) and subparagraph (2) of that section indicates that "[i]f a protest causes the agency, within 1 year of contract award, to . . . [i]ssue a new request for revised proposals on the protested contract award, the contracting officer shall provide the information in paragraph (c) of this section to offerors that were in the competitive range and are requested to submit revised proposals." 48 C.F.R. § 15.507(b)(2). Paragraph (c) of section 15.507 states that the "following information" shall be provided—"(1) Information provided to unsuccessful offerors in any debriefings conducted on the original award regarding the successful offeror's proposal; and (2) Other nonproprietary information that would have been provided to the original offerors." Based upon this regulation, as well as principles of fairness, various cases have held that the disclosure of information "to equalize competition is an appropriate alternative to eliminating an offeror from a competition due to a prior disclosure of information that could result in an unfair competitive advantage." *Cowperwood Co.,* B–274140.2, 96–2 CPD ¶ 240, at 3,

---

30. The fact that Lockheed Martin's technical proposal may have more issues warranting discussion than ManTech's does mean that the Army will be favoring Lockheed Martin in discussing those points. While the regulations require meaningful and fair discussions, they do not require that the agency conduct exactly the same discussions with each offeror. *See Dynacs Eng'g Corp.,* 48 Fed.Cl. at 131; *ACRA, Inc. v. United States,* 44 Fed.Cl. 288, 295–96 (1999).

1996 WL 738440 (Comp.Gen.1996) (citing *KPMG Peat Marwick*, B–251902.3, 93–2 CPD ¶272, 1993 WL 476704 (Comp.Gen. 1993)). *See also Sperry Corp.*, B–222317, 86–2 CPD ¶48, 1986 WL 60664 (Comp.Gen. 1986). According to this court, "[t]hese decisions make clear that when an unsuccessful offeror lawfully obtains source selection information, such as a competitors prices and technical scores, and the agency subsequently properly reopens negotiations, the agency may disclose similar information to all the competitors to eliminate any competitive advantage." *DGS Contract Serv. Inc. v. United States*, 43 Fed.Cl. 227, 238 (1999).

 ManTech, however, argues that the information that the Army proposes to provide to Lockheed Martin is not "similar" to that which was provided to ManTech at the debriefing. Indeed, the administrative record supports this claim, as it reflects that Lockheed Martin's Chart A contained only some of its actual labor costs, [ ] were not revealed to ManTech. By comparison, ManTech's total evaluated price reflects virtually all its labor costs for the entire GENESIS contract. Consequently, if the Army discloses ManTech's price to Lockheed Martin as part of the proposed corrective action, Lockheed Martin will receive more information than ManTech received during the debriefing. Thus, ManTech reasonably contends that providing its information to Lockheed Martin would not equalize the competitive, but instead provide Lockheed Martin with a decided advantage. At this juncture, one might assume that the court is left on the horns of a dilemma—if it does not allow the Army to provide the information, ManTech retains an informational advantage; if it does allow the Army to provide the information, Lockheed Martin obtains an informational advantage. But, further review shows that assumption to be false.

Turning first to whether Lockheed Martin should obtain ManTech's price information, the court agrees with ManTech that the pric-

ing information contained in its proposal is fundamentally different from what it received during the debriefing. In particular, while ManTech's pricing information largely reflected adjustments for [ ], so as to reflect a true fully loaded rate, Lockheed Martin's pricing information [ ]. Certainly, some of those costs were reflected in the adjustments made to Lockheed Martin's price before giving it to ManTech, but the level of precision in those adjustments is somewhat suspect and it seems clear from the record that significant costs were left unaccounted.[31] Thus, providing Lockheed Martin with ManTech's information would not equalize the competition, but rather provide Lockheed Martin with an unwarranted advantage and thereby prejudice ManTech.

Conversely, whatever advantage that ManTech obtained by receiving Lockheed Martin's pricing information is largely illusory, negated by the fact that ManTech did not also receive detailed information regarding the costs that Lockheed Martin [ ]. Because, under the amended solicitation, [ ], and because the Army and Lockheed Martin assert that the technical requirements in the Solicitation need to be changed, ManTech has no real sense as to what final price Lockheed Martin might offer under the amended solicitation. In these circumstances, the court holds that the requirements of section 15.507 of the FAR do not require the Army to provide Lockheed Martin with ManTech's pricing information. *See Norvar Health Servs.*, B–286253.2, 2000 CPD ¶204, 2000 WL 1804708 (Comp.Gen.2000) (material changes to solicitation renders disclosure of offeror's initial price meaningless); *Sun Microsystems Fed., Inc.*, B–254497.2, B–254497.3, 94–1 CPD ¶318, at 10 (Comp.Gen. 1994) (holding exchange of information unnecessary due to changes in the agency's requirements and passage of time). Moreover, the court concludes that the principles of fairness embodied in the FAR, indeed, preclude such an exchange. *See* 48 C.F.R. § 1.602–2.

---

31. In this regard, the court notes the apparent inconsistency between the $10 million adjustment and [ ]. By comparison, the "cost realism" adjustment made by the Army, which were to account [ ], reflected an increase of only approximately [ ] percent. Notably, in its preliminary findings, the GAO also found that the Army's cost realism analysis was flawed.

The court, however, reaches a different conclusion regarding the proposal to provide Lockheed Martin with ManTech's adjectival ratings. In this instance, it appears that ManTech has precisely the same type of information that the Army proposes to provide to its competitor. As such, section 15.507 of the FAR requires that the information be provided to Lockheed Martin in order to equalize the competition here.

#### d. Allowing the Offerors to Submit New Proposals

The last component of the proposed corrective action anticipates that new proposals will be submitted in response to the amended solicitation and that a new selection process will proceed. This prong of the proposed action is dictated by section 15.307 of the FAR, which mandates that "[a]t the conclusion of discussions, each offeror still in the competitive range shall be given an opportunity to submit a final proposal revision." 48 C.F.R. § 15.307(b). This court, indeed, has specifically held that once discussions are conducted with offerors in the competitive range, the filing of revised final proposals is compulsory. *See Dubinsky v. United States,* 43 Fed.Cl. 243, 261–64 (1999).[32] *See also SMS Data Products Group, Inc.,* 940 F.2d at 1518.

#### e. ManTech's Alternative Action: An Outright Award

As the foregoing discussion clearly suggests, ManTech is flatly wrong in arguing that the only appropriate "corrective action" here is to award it the contract. This contention hinges on the notion, soundly rejected above, that Lockheed Martin's proposal fatally deviated from the Solicitation and that ManTech's proposal, therefore, was the only

one that should have been considered. In effect, via this contention, ManTech attempts to inject the concept of responsiveness into this negotiated procurement, suggesting a result that would occur were this a sealed bid procurement. This court, however, has held that "the sealed bid concept of 'responsiveness' generally does not apply to negotiated procurements." *See Input/Output Tech., Inc. v. United States,* 44 Fed.Cl. 65, 69 n. 5 (1999). *See also DeMat Air, Inc. v. United States,* 2 Cl.Ct. 197, 202 (1983); *Gardiner, Kamya & Assocs., P.C.,* B–258400, 95–1 CPD ¶ 191, at 2, 1995 WL 19599 (Comp.Gen.1995); *Loral Terracom; Marconi Italiana,* B–224908, B224908.2, 87–1 CPD ¶ 182, at 8, 1987 WL 96905 (Comp.Gen.1987) ("[T]he concept of responsiveness ... generally does not apply to the give-and-take of negotiated procurements."). Rather, as discussed above, if, in a negotiated procurement, an offeror submits a proposal that deviates from the requirements of the RFP, the government need not exclude that offeror, but may take various steps to bring the offeror's proposal into conformity with the government's needs, while preserving fair competition among all offerors.

At all events, there are serious questions as to whether this court is ever authorized to award directly a contract. This court noted in *CCL Service,* 43 Fed.Cl. at 688, that "[s]election of a contractor among the protestors and award of the contract are improper exercises of the court's authority." *See also Durable Metals Prods., Inc. v. United States,* 27 Fed.Cl. 472, 476 ("Moreover, the equitable jurisdiction of this court does not include the authority to award a contract as plaintiff requests."), *aff'd,* 11 F.3d 1071 (Fed.Cir.1993) (table). Further, in a decision that provided part of the impetus for this court's bid pro-

---

**32.** Thus, in *Dubinsky v. United States,* this court explained:

FAR 15.307(b) ... requires a contracting officer, at the conclusion of discussions, to issue a request for final proposal revisions by a common cut-off date. These final proposal revisions form the basis upon which the contract is awarded. This requirement is not merely surplusage; it is an essential final step in the competition process. By providing offerors remaining in the competitive range an opportunity to present their final offers to the Government, it allows them to incorporate the knowledge they have gleaned from discus-

sions; by providing a common cut-off date, it sets a level playing field on which they may compete for the contract. It allows the Government to reap the fruits of the discussion process .... FAR 15.307(b), therefore, is an essential requirement once an agency engages in the discussion process. In short, it cannot be severed from FAR 15.306(d).

43 Fed.Cl. at 263–64. *See also TMC, Inc.,* B–230078, B–230079, 88–1 CPD ¶ 492, 1988 WL 227160 (Comp.Gen.1988) (once ground rules change, all offerors within competitive range must be offered an opportunity to revise proposals).

test jurisdiction, the D.C. Circuit stated "[i]t is indisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties." *Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859, 869 (D.C.Cir. 1970). *See also Delta Data Sys. Corp. v. Webster,* 744 F.2d 197, 204 (D.C.Cir.1984) (refusing to direct award in negotiated procurement where only one offeror remained and noting that the agency had alternatives rather than awarding to remaining offeror under the original solicitation). *Cf. Parcel 49C Ltd. Partnership v. United States,* 31 F.3d 1147, 1153 (Fed.Cir.1994). These considerations particularly resonate in a case, such as this, which involves not only highly technical requirements, but also national security concerns.

Nonetheless, the court need not resolve this issue here, for even if this court were empowered to award contracts, the circumstances of this case clearly would not warrant such relief, as a less extreme and reasonable alternative exists for correcting the problems with the proposed corrective action, thereby permitting the agency to exercise its discretion. Accordingly, there is no basis for this court to award the GENESIS contract to ManTech.

## III. CONCLUSION

Let there be no mistake that if this court, rather than the Army, were constructing the corrective action here, a different plan might be adopted. But, that is not this court's prerogative. Rather, for the reasons stated above, the court concludes that the Army's proposed corrective action largely falls within the bounds of reasoned decisionmaking and may proceed, with one notable exception— the Army may not provide Lockheed Martin with ManTech's pricing information. Regarding this proviso, the court finds that plaintiff has met the prerequisites for the issuance of permanent injunctive relief, as it has not only demonstrated the correctness of its position, but also that the harm it would experience via the release of its pricing information outweighs any harm Lockheed might experience by not receiving that information. Further, the court finds that the public inter-

est is served by not releasing that pricing information, as withholding that information is consonant with the fairness principles embodied in, and underlying, the FAR. *See Seattle Sec. Servs., Inc.,* 45 Fed.Cl. at 571. In consideration of the above, **IT IS ORDERED:**

1. Plaintiff's motion for judgment on the administrative record is **GRANTED, IN PART,** and **DENIED, IN PART,** and defendant's cross motion for judgment on the administrative record is **GRANTED, IN PART** and **DENIED, IN PART**.

2. Defendant, its agencies and officers are hereby enjoined from releasing to Lockheed Martin the pricing information supplied by ManTech in response to Request for Proposals No. DASC01–00R–0002.

3. In all other respects, the corrective action proposed by defendant may proceed forthwith, in a manner not inconsistent with this opinion.

4. This opinion shall be published as issued after April 2, 2001, unless the parties identify protected and/or privileged materials subject to redaction prior to said date. Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for that redaction.